# EXHIBIT A



National Credit Union Administration

Office of General Counsel

February 13, 2026

SENT BY EMAIL

Ellen and Alexander Plotkin
43 Saxonia Avenue
Wyckoff, NJ 07481
ellenpltkn@gmail.com
alexpltkn@yahoo.com

RE: NCUA Board Appeal (Docket No. BD-10-25)

Dear Mr. and Ms. Plotkin:

I am writing regarding the appeal you filed with the National Credit Union Administration Board (Board), appealing your uninsured shares reconsideration determination by the Liquidating Agent for former Unilever Federal Credit Union.

Please be advised we are administratively denying your appeal. *See* 12 C.F.R. §746.206(b). This administrative denial constitutes a final agency determination. Pursuant to 12 C.F.R. §745.202(c), this final determination is reviewable in accordance with the provisions of Chapter 7, Title 5, United States Code, by the United States District Court for the Federal judicial district where your credit union's principal place of business was located. Such action must be filed within 60 days of the date of this letter.

Should you have any questions, I may be reached by email at pyu@ncua.gov or by phone at 703-548-2666.

Sincerely,

Digitally signed by PAMELA YU
Date: 2026.02.13 14:58:32 -07'00'

Pamela Yu
Special Counsel to the General Counsel

OGC/PWY:bhs
BD-10-25

cc: Melane Conyers-Ausbrooks, Secretary of the Board

# EXHIBIT B - March 3, 2026 NCUA Clarification Letter (Deemed Denial)

**From:** Yu, Pamela PYu@NCUA.GOV 🖉
**Subject:** VMs re NCUA BD-10-25
**Date:** March 3, 2026 at 2:46 PM
**To:** ellenpltkn@gmail.com

Ms. Plotkin:

I am writing in response to your February 25 and 27 voicemails. I understand you are seeking clarification about the correspondence you recently received from the National Credit Union Administration.

The letter of February 13, 2026 regarding your NCUA Board appeal BD-10-25 constitutes a final agency action reviewable in accordance with chapter 7 of title 5 of the United States Code, 5 U.S.C. § 702. Under the NCUA's regulations, failure by the Board to issue a decision on an appeal within 90 days shall be deemed to be a denial of the appeal. 12 C.F.R. 746.206(b). Accordingly, the NCUA has issued a final agency action on your administrative appeal, and you have now exhausted your administrative remedies in this matter. This means that, if you are not satisfied with the agency's response, you have the right to seek judicial review by filing a claim with the United States district court for the Federal judicial district where the principal place of business of the credit union is located. Please be advised that the statute of limitations for any request for judicial review of a final agency action by the NCUA Board regarding a claim for insurance coverage is 60 days after the date on which such determination is issued. 12 C.F.R. §745.202(c). We are in receipt of the litigation hold notice you sent on February 18, 2026.

I hope this information is helpful to you. As a courtesy, I am also resending copies of the February 13, 2026 letter, as well as the liquidating agent's September 19, 2025, uninsured shares reconsideration determination regarding your accounts at former Unilever Federal Credit Union.

Best regards,



**Pamela Yu**
Special Counsel to the General Counsel
National Credit Union Administration
1775 Duke Street | Alexandria, VA 22314
(O) 703-548-2666 | (C) 571-242-4307| pyu@ncua.gov

SENSITIVE ATTORNEY COMMUNICATION: This transmission contains confidential information intended only for the addressee(s). This information may also be privileged and/or subject to attorney work-product protection. If you are not the intended recipient, any use, dissemination, distribution or copying of this transmission, including attachments, is strictly prohibited. If you received this transmission in error, please contact the sender.

---

**Controlled Notice: The information contained in this email and any attachments may be Controlled Unclassified Information subject to dissemination controls, restrictions, or safeguarding requirements pursuant to a federal law, regulation, or policy. Any use, distribution, or copying of this email, including any of its**

contents or attachments by any person other than those authorized by the National Credit Union Administration, or for any purpose other than its intended use, is strictly prohibited. If you believe you have received this email in error, permanently delete the email and any attachments, and do not save, copy, disclose, or rely on any part of the information contained in this email or its attachments. Please call 703-518-6540 if you have questions.

**Uninsured Shares...** 204 KB

**BD-10-25 EAPlotkin_Final...** 268 KB

# EXHIBIT C.  Original Emailed Initial Determination (No Funds Sent)



National Credit Union Administration
Asset Management & Assistance Center

# UNINSURED SHARES
# INITIAL DETERMINATION

June 23, 2025

Ellen Plotkin
Alexander Plotkin
43 Saxonia Avenue
Wyckoff, NJ 07418

Dear Mr. and Mrs. Plotkin:

RE:  Unilever Federal Credit Union

The Unilever Federal Credit Union was placed into liquidation by the National Credit Union Administration (NCUA) Board on April 30, 2025. As the liquidating agent of Unilever Federal Credit Union, I have authority to conclude the affairs of the credit union, pursuant to Section 207(b) of the Federal Credit Union Act [12 U.S.C. § 1787(b)]. This includes the authority to make initial share insurance determinations on Unilever Federal Credit Union accounts.

We have determined that, as of the date of liquidation, $259,625.28 of your account is uninsured, per Section 207(k) of the Federal Credit Union Act [12 U.S.C. § 1787(k)] and part 745 of NCUA Regulations [12 C.F.R. § 745]. This amount was uninsured because informal revocable trust accounts (i.e. accounts naming payable on death (POD) beneficiaries) are covered up to $250,000 per beneficiary for each owner. Enclosed is a check for $59,789.50 to Ellen Plotkin for her sole ownership in certificate #35 and $982,432.75 representing your remaining joint insured shares. A check was previously issued to Ellen Plotkin for $250,000 for her insured portion.

Revocable Trust Accounts

| Actions | Account Nickname | Balance | Owner(s) | Beneficiaries |
|---------|------------------|---------|----------|---------------|
| Edit Delete | Share 01 | $8.10 | Ellen Plotkin Alex Plotkin | Elan Plotkin Mark Plotkin |
| Edit Delete | CD#26 | $118,512.40 | Ellen Plotkin Alexander Plotkin | Mark Plotkin |
| Edit Delete | CD#36 | $167,041.71 | Ellen Plotkin Alexander Plotkin | Elan Plotkin |
| Edit Delete | CD #37 | $324,850.55 | Ellen Plotkin | Elan Plotkin Mark Plotkin |

10910 Domain Drive — Suite 200 — Austin, TX 78758-7758
512-231-7900

Ellen Plotkin
June 23, 2025
Page 2

| Actions | Account Nickname | Balance | Owner(s) | Beneficiaries |
|---|---|---|---|---|
| Actions | CD#31 | $115,120.40 | Ellen Plotkin Alexander Plotkin | Lisa Plotkin Mark Plotkin |

| Insurance Summary | Balance | Insured | Uninsured |
|---|---|---|---|
| Ellen Plotkin PODITF Lisa Plotkin, Mark Plotkin | $764,026.28 | $500,000.00 | |
| Max Plotkin PODITF Lisa Plotkin Mark Plotkin | $1.08 | $1.08 | $0.00 |
| Alexander Plotkin PODITF Mark Plotkin Lisa Plotkin | $361,670.26 | $361,670.26 | $0.00 |

An explanation of your right to request a reconsideration or appeal a determination by the liquidating agent is enclosed. You may also find detailed information regarding NCUA's appeals regulation at 12 C.F.R. part 746, subpart B.

The enclosed Certificate of Claim in Liquidation enables you to share in the proceeds of the liquidation of the credit union, if any, up to the uninsured amount. Please notify us if you have an address change during the liquidation period prior to receipt of notification of a final distribution or completion of the liquidation.

Also enclosed is a Payable on Death Update Form. With it, you have the option of identifying one or more beneficiaries to any proceeds to which you are entitled from the Certificate of Claim in Liquidation.

If you have any questions or need additional information, please contact member services at (512) 231-7940 or via email at AMACMail@ncua.gov.

Sincerely,

Cory Phariss
Liquidating Agent

AMAC/TBL/MMG
FCU 05736-2618
Enclosures (5)



**EXHIBIT C.  Initial Determination with Incorrect CD35**

—— National Credit Union Administration ——
Asset Management & Assistance Center

## UNINSURED SHARES
## INITIAL DETERMINATION

July 24, 2025

Ellen Plotkin
Alexander Plotkin
43 Saxonia Avenue
Wyckoff, NJ 07418

Dear Mr. and Mrs. Plotkin:

RE:  Unilever Federal Credit Union

The Unilever Federal Credit Union was placed into liquidation by the National Credit Union Administration (NCUA) Board on April 30, 2025. As the liquidating agent of Unilever Federal Credit Union, I have authority to conclude the affairs of the credit union, pursuant to Section 207(b) of the Federal Credit Union Act [12 U.S.C. § 1787(b)]. This includes the authority to make initial share insurance determinations on Unilever Federal Credit Union accounts.

We have determined that, as of the date of liquidation, $259,625.28 of your account is uninsured, per Section 207(k) of the Federal Credit Union Act [12 U.S.C. § 1787(k)] and part 745 of NCUA Regulations [12 C.F.R. § 745]. This amount was uninsured because informal revocable trust accounts (i.e. accounts naming payable on death (POD) beneficiaries) are covered up to $250,000 per beneficiary for each owner. Enclosed is a check for $59,789.50 to Ellen Plotkin for her sole ownership in certificate #35 and $982,432.75 representing your remaining joint insured shares. A check was previously issued to Ellen Plotkin for $250,000 for her insured portion.

Revocable Trust Accounts

| Actions | Account Nickname | Balance | Owner(s) | Beneficiaries |
|---|---|---|---|---|
| Edit/Remove | Share 01 | $8.16 | Ellen Plotkin Alex Plotkin | Ellen Plotkin Mark Plotkin |
| Edit/Remove | CD#28 | $116,512.40 | Ellen Plotkin Alexander Plotkin | Mark Plotkin |
| Edit/Remove | CD#36 | $167,641.71 | Ellen Plotkin Alexander Plotkin | Ellen Plotkin |
| Edit/Remove | CD #37 | $381,950.85 | Ellen Plotkin | Ellen Plotkin Mark Plotkin |

Ellen Plotkin
July 24, 2025
Page 2

| Actions | Account Nickname | Balance | Owner(s) | Beneficiaries |
|---|---|---|---|---|
| Pre-Default | CD#34 | $445,186.40 | Ellen Plotkin Alexander Plotkin | Elan Plotkin Mark Plotkin |
| | Insurance Summary | Balance | Insured | Uninsured |
| | Ellen Plotkin POD/ITF Elan Plotkin, Mark Plotkin | $759,626.28 | $500,000.00 | $259,626.28 |
| | Alex Plotkin POD/ITF Elan Plotkin Mark Plotkin | $4.08 | $4.08 | $0.00 |
| | Alexander Plotkin POD/ITF Mark Plotkin Elan Plotkin | $364,670.26 | $364,670.26 | $0.00 |

An explanation of your right to request a reconsideration or appeal a determination by the liquidating agent is enclosed. You may also find detailed information regarding NCUA's appeals regulation at 12 C.F.R. part 746, subpart B.

The enclosed Certificate of Claim in Liquidation enables you to share in the proceeds of the liquidation of the credit union, if any, up to the uninsured amount. Please notify us if you have an address change during the liquidation period prior to receipt of notification of a final distribution or completion of the liquidation.

Also enclosed is a Payable on Death Update Form. With it, you have the option of identifying one or more beneficiaries to any proceeds to which you are entitled from the Certificate of Claim in Liquidation.

If you have any questions or need additional information, please contact member services at (512) 231-7940 or via email at AMACMail@ncua.gov.

Sincerely,

Cory Phariss
Liquidating Agent

AMAC/TBL/MMG
FCU 05736-2618
Enclosures (5)

 National Credit Union Administration ───────
Asset Management & Assistance Center

# UNINSURED SHARES
# INITIAL DETERMINATION

July 23, 2025

Ellen Plotkin
Alexander Plotkin
43 Saxonia Avenue
Wyckoff, NJ 07418

Dear Mr. and Mrs. Plotkin:

RE:  Unilever Federal Credit Union

The Unilever Federal Credit Union was placed into liquidation by the National Credit Union Administration (NCUA) Board on April 30, 2025. As the liquidating agent of Unilever Federal Credit Union, I have authority to conclude the affairs of the credit union, pursuant to Section 207(b) of the Federal Credit Union Act [12 U.S.C. § 1787(b)]. This includes the authority to make initial share insurance determinations on Unilever Federal Credit Union accounts.

We have determined that, as of the date of liquidation, $259,625.28 of your account is uninsured, per Section 207(k) of the Federal Credit Union Act [12 U.S.C. § 1787(k)] and part 745 of NCUA Regulations [12 C.F.R. § 745]. This amount was uninsured because informal revocable trust accounts (i.e. accounts naming payable on death (POD) beneficiaries) are covered up to $250,000 per beneficiary for each owner. Enclosed is a check for $55,789.50 to Alexander Plotkin for his sole ownership in certificate #35 and $982,432.75 representing your remaining joint insured shares. A check was previously issued to Ellen Plotkin for $250,000 for her insured portion.

Revocable Trust Accounts

| Actions | Account Nickname | Balance | Owner(s) | Beneficiaries |
|---|---|---|---|---|
| | Share 01 | $8.16 | Ellen Plotkin Alex Plotkin | Ellen Plotkin Mark Plotkin |
| | CD#28 | $116,512.49 | Ellen Plotkin Alexander Plotkin | Mark Plotkin |
| | CD#36 | $167,641.71 | Ellen Plotkin Alexander Plotkin | Ellen Plotkin |
| | CD #37 | $394,950.95 | Ellen Plotkin | Ellen Plotkin Mark Plotkin |

Ellen Plotkin
July 23, 2025
Page 2

| Actions | Account Nickname | Balance | Owner(s) | Beneficiaries |
|---|---|---|---|---|
| Edit Details | CD#34 | $445,186.40 | Ellen Plotkin Alexander Plotkin | Ellen Plotkin Mark Plotkin |

| | Insurance Summary | Balance | Insured | Uninsured |
|---|---|---|---|---|
| | Ellen Plotkin POD/ITF Ellen Plotkin, Mark Plotkin | $759,625.28 | $500,000.00 | $259,625.28 |
| | Alex Plotkin POD/ITF Ellen Plotkin, Mark Plotkin | $4.08 | $4.08 | $0.00 |
| | Alexander Plotkin POD/ITF Mark Plotkin, Ellen Plotkin | $364,670.26 | $364,670.26 | $0.00 |

An explanation of your right to request a reconsideration or appeal a determination by the liquidating agent is enclosed. You may also find detailed information regarding NCUA's appeals regulation at 12 C.F.R. part 746, subpart B.

The enclosed Certificate of Claim in Liquidation enables you to share in the proceeds of the liquidation of the credit union, if any, up to the uninsured amount. Please notify us if you have an address change during the liquidation period prior to receipt of notification of a final distribution or completion of the liquidation.

Also enclosed is a Payable on Death Update Form. With it, you have the option of identifying one or more beneficiaries to any proceeds to which you are entitled from the Certificate of Claim in Liquidation.

If you have any questions or need additional information, please contact member services at (512) 231-7940 or via email at AMACMail@ncua.gov.

Sincerely,

Cory Phariss
Liquidating Agent

AMAC/TBL/MMG
FCU 05736-2618
Enclosures (5)

# EXHIBIT D

Ellen and Alexander Plotkin
43 Saxonia Avenue
Wyckoff NJ 07481
alexpltkn@yahoo.com
551-298-2483

August 21, 2025

VIA ZixCorp Secure EMAIL (amac@ncua.gov)

Mr. Cory Phariss, Liquidating Agent
Asset Management & Assistance Center
National Credit Union Administration
10910 Domain Drive, Suite 200
Austin TX 78758

Re:    UNILEVER Federal Credit Union ("UNILEVER FCU") - - Plotkin Accounts 11596
       <u>REQUEST FOR RECONSIDERATION</u>

Dear Mr. Phariss:

The Initial Determination dated **July 24, 2025** found Uninsured **$259,625.28** of our life's earnings and savings. This is a Request for Reconsideration consistent with the procedures set forth in 12 CFR 745 and 746. Additional Insured Funds are warranted as UNILEVER FCU administrative error correction.

REQUEST FOR RELIEF:

1.  **Restore** long-held Insured Joint Share Certificate Accounts No. **20** and No. **22**, resulting in additional insured shares of at least **$87,643.46**. <u>See</u> calculations below and March 2025 Statement, of record. A blatant error of shifting funds from insured to uninsured caused by UNILEVER FCU record compliance failures <u>occurred less than 3 months to liquidation</u>, during the turbulent and disruptive pre-liquidation period and core processor changes;

    **And/Or**

2.  **Reclassify** All and/or the Revised portion of the Uninsured accounts, based on documented assurances by UNILEVER FCU personnel about the goal of NCUA insurance with each account opening, such that all the deposits are insured by the NCUA, i.e., total amount of **$259,625.28** insured and returned.

Attached is new evidence not in Member's file received from AMAC, and therefore not considered for the Initial Determination, together with context and analysis presented below regarding the full impact of correspondence as a whole. *Attachment 1* is new in part, *Attachments 3 and 4* are new.

**FACTS/BASIS**

UNILEVER FCU compliance failure, which occurred and continued during and as a result of their core processor/system conversion shortly prior to liquidation, warrants restoration of Joint Accounts.

Credit Unions are required to maintain adequate and accurate records of account ownership and insurance coverage. The reason for such duty on a depository institution is to avoid precisely the type of confusion that occurred here due to UNILEVER FCU neglect to maintain documentation and review files

for accuracy and completeness. The movement of funds from Joint share certificate accounts **20** and **22** to POD share certificate accounts 37 and 34, respectively (as seen in the January-March 2025 Statement of Account, of record) was not supported by filled out or signed Share Certificate documents. In addition, UNILEVER FCU provided us with incorrect October – December 2024 and January – March 2025 Statements of Account. The Statements were and at least up to the date of liquidation remained incorrect as to account classification even after UNILEVER FCU personnel acknowledged/admitted in January 2025 that errors were due to their changing core processor systems. For example, the statements continued to fail to show Accounts **28** and **36** as POD. UNILEVER FCU failed to keep correct records, which caused confusion with wrong and/or absent records and lack of online access, leading to "blind" aggregation calculations to us (but not to UNILEVER FCU), resulting in the shift of long-standing insured Joint accounts **20** and **22** to uninsured POD accounts 37 and 34, respectively. Had UNILEVER FCU records been correct, they would have shown that the aggregate Joint account amount was fully insured. *This error is unique as it occurred in this period of apparent preparation for liquidation and core processor changes. Therefore, reinstating the Joint share certificate accounts* **20** *and* **22** *would not be precedential.*

In particular, e-mail correspondence of January 29- February 7, 2025 demonstrates the confusion caused by incorrect or unavailable account statements and records, which led to erroneous transfer of long-standing Joint accounts **20** and **22** to POD accounts 37 and 34, respectively. See *Attachment 1* hereto (New Evidence, in part, marked for emphasis). **This January 29-February 7 correspondence needs to be viewed as a whole for the full context.** On January 29, 2025, Member was concerned about the upcoming UNILEVER move to Hoboken, concerned about Insurance, and confused by an incorrect October – December 2024 Statement of Account, as well as lack of account ownership information on the UNILEVER FCU online access system. In ensuing correspondence between Member and UNILEVER FCU professional (Member Services Supervisor), Member's primary concern was Insurance. Nevertheless, UNILEVER FCU shifted insured Joint funds to uninsured POD accounts less than three (3) months to the date of liquidation, during a period of disruption due at least in part by core processor conversion, while share certificates **20** and **22** were long-standing Joint Accounts. As such, dues on these accounts have been paid into the Insurance Fund all along. Moreover, this mistaken transfer of funds was not supported by proper documentation signed by Members. The correspondence, viewed as a whole, proves that the error was caused by UNILEVER FCU failure to administer accurate records and systems. Therefore, the undocumented move of the funds to the POD accounts should be reversed. Joint accounts **20** and **22** should be reinstated by reversing the mistaken transfer, resulting in lower aggregate POD funds, warranting return of additional insured funds. See calculations below.

## RECALCULATION BASED ON REINSTATEMENT OF SHARE CERTIFICATE ACCOUNTS **20** and **22**

Accounts Nos. **20** and **22** were long-standing Joint accounts according to the Membership file, of record. Joint Account No. **20** was opened in 2009 and Joint Account No. **22** was opened in 2018. Both accounts were held as fully insured under 12 C.F.R. § 745.8 until the transfer error in February 2025, caused by CU failure to keep records, with less than three (3) months remaining to the date of liquidation.

Note: Numbers are approximate, taken from the January–March 2025 Account Statement, with interest to April 2025 to be consistent with the numbers used in AMAC's calculations. Table formats follow those in the Initial Determination letter.

Table 1. Joint CD Accounts Reinstated

| JOINT Account Nickname | Per March 2025 Statement | With Interest to April 2025 |
|---|---|---|
| CD # 20 | $58,923.03 | $59,659.57 |
| CD # 22 | $55,268.77 | $55,959.63 |

2

Aggregation of the Joint Account Nos. **20** and **22** with the other Joint Account Nos. 21 and 29 gives a total Insured Joint account amount of about **$483,377.61**(fully Insured Amount, under the limit of $500,000). In accordance with this recalculation, the <u>amounts in POD accounts 37 and 34 are reduced</u> by what was mistakenly transferred there from accounts **20** and **22**, respectively, resulting in the calculation in Table 2:

Table 2.  Revocable Trust Accounts

| POD Account Nickname | Owner(s) | Beneficiaries | Note | Balance |
|---|---|---|---|---|
| CD # 28 | Ellen PLOTKIN Alexander PLOTKIN | Mark Plotkin | Same as Initial Determination | $116,512.40 |
| CD # 36 | Ellen PLOTKIN Alexander PLOTKIN | Elan Plotkin | Same as Initial Determination | $167,641.71 |
| CD # 34 | Ellen PLOTKIN Alexander PLOTKIN | Elan Plotkin Mark Plotkin | POD amount reduced by that in CD # 22 | $389,226.77 |
| CD # 37 | Ellen PLOTKIN | Elan Plotkin Mark Plotkin | POD amount reduced by that in CD # 20 | $335,291.38 |

Table 3.  Insurance Summary, per revocable trust (POD) account Insurance Rules 12 C.F.R. § 745.4:

| INSURANCE SUMMARY | Balance | Insured | New Uninsured |
|---|---|---|---|
| Ellen POD Elan,Mark | $671,981.82 | $500,000.00 | $171,981.82 |
| Alex POD Elan, Mark | $336,690.44 | $336,690.44 | |

The difference between the Initially Determined uninsured amount of **$259,625.28** and the recalculated Uninsured amount of **$171,981.82** is:  **$87,643.46**.

Consequently, we respectfully request that AMAC reverse an unfortunate UNILEVER FCU technical error during a turbulent time of known system instability shortly prior to liquidation.  This is a narrow request for error correction, within AMAC's scope of authority.  Members respectfully request <u>Additional Insured Funds of **$87,643.46**</u>.

The additional grounds below further support our Request.

**<u>Expressed Insurance Intent</u>**
Based on continual communication with trusted UNILEVER FCU personnel about the <u>goal of NCUA insurance with each account opening</u>, the accounts should be reclassified as UNILEVER FCU should have done in order to achieve our stated goals.  For example, *Attachment 2* (marked), an email of December 1, 2023, expresses our **goal** of establishing the Share Certificate account in order to be covered under NCUA Insurance (after having had a telephone conversation with the Member Services Supervisor prior, apprising her of our goal of NCUA insurance).  We relied on the Supervisor's advice that POD will create an NCUA insured account.  As a further example, we expressed the **goal** to be covered by NCUA insurance when opening a new Share Certificate in 2021, *as seen in Attachment 3* (New Evidence).  All Share Certificates were opened with UFCU help for the **specific goal** of protection under NCUA insurance.  We <u>entrusted</u> these funds to our workplace integrated credit union institution under the corporate sponsorship of UNILEVER for many years, and for at least the over 20 years that we have been Members.  UNILEVER FCU betrayed that trust.  This is a hard-earned cash, relied upon in what was supposed to be a safe deposit in a trusted Unilever umbrella membership institution under the protection of the NCUA.  Unfortunately, while UNILEVER FCU staff were aware of the correct aggregate

3

amounts in the Joint accounts and in the POD accounts, they failed to properly advise. See *Attachment 1*, Emails of January-February 2025 (X-ref: Request 1 above). The accounts should be reclassified.

As an employee credit union, garnering the trust of its members, UNILEVER FCU should have responded to our **stated goal** for NCUA Insurance and should have advised that the account structure leaves uninsured funds. Acting in *good faith*, notice of uninsured funds would have been appropriate. UNILEVER FCU failure to do so exhibits breach of trust and/or negligence and/or breach of fiduciary duty and/or omission of material fact. The move of insured Joint Funds to POD was not only erroneous (see Request (1) above), but reckless disregard on the part of UNILEVER FCU. In any event, UNILEVER FCU personnel would have known that there were uninsured funds, as they were paying premiums/dues to the NCUA Insurance Fund based only on the insured amounts. As UNILEVER FCU knew they had losses on their Balance Sheets and were likely anticipating NCUA action -- would they deliberately intend to minimize dues to NCUA and not structure accounts for full NCUA insurance upon Member concern for such? **Member accounts should be restructured now as UNILEVER FCU should have done.** The NCUA Board decision in *Espirito Santo Federal Credit Union,* NCUA Docket BD-99-02 (Feb. 24, 1999) authorizes AMAC to reclassify accounts by administrative correction of credit union lapses.

Member protection should be the overriding NCUA concern, particularly in the face of blind set-ups/account structuring by UNILEVER FCU, without regard for insurance. Member accounts should be reclassified for maximum NCUA Insurance. The intent behind the NCUA statutes, regulations, and trust in Insurance is to boost credit union business by encouraging Shareholders to invest more with different types of account categories. Therefore, to the extent **Shareholders specifically wanted/requested to have NCUA insurance**, they should have it by proper classification and/or re-classification of accounts where possible. On the other hand, if Shareholders had wanted to invest more than what is covered under NCUA insurance and took on that risk, then they may be left uninsured. Here, Members specifically requested and acted with the **specific goal of NCUA insurance** (that goal was overriding over the POD designations). Moreover, as no information or notice was provided by UNILEVER FCU and their professionals, the lack of informed consent to uninsured account funds is a violation of Members' rights to due process. Accordingly, these accounts should be reclassified for maximum NCUA Insurance.

There are ways to reclassify Member Funds such that they are fully insured or insured to a greater extent. By way of example, CD **37** Ellen POD Elan & Mark, can be reclassified as Individual by removing POD designation. The only record sent by UNILEVER FCU after the "blind" funds shift, the screenshot of account **37**, exacerbates UNILEVER FCU lack of accurate member-facing records. The screenshot of account **37** evidences that the account was not properly documented as POD. *Reclassification of CD 37 as Individual (No POD) is consistent with UNILEVER FCU records*, as they did not in *good faith* hold this account as POD in the regular course of business. See at least the following evidence:

- October-December 2024 Statement of Account, of record, shows Individual ownership; and
- the original Share Certificate Account opening document did not include the POD designation; and
- the Screen Shot of the Share Certificate **37** record of February 10, 2025 (*Attachment 4*) is wrong:
    - "Pay on Death" line at the bottom is blank; and
    - The "Last CAN" field contains an account number that is not recognizable as ours; and
    - The Maturity Date is wrong in violation of the Truth in Lending requirement (24 month share certificate should mature on 10/30/2025).

This is a non-limiting example of how accounts may be reclassified for more Insurance.

4

**Representations Leading to Continued Deposits with UNILEVER FCU**

In addition, shown in *Attachment 1* is how UNILEVER Member Services Supervisor advertised the well-being of the UNILEVER FCU during a period of disruption-e.g. core processor, in the lead up to liquidation. The representations made Member comfortable maintaining funds with UNILEVER FCU, after expressing concern as to what would happen with the UNILEVER FCU after the corporate Sponsor's imminent move to Hoboken. This advertisement of services/enticement occurred less than three (3) months to liquidation. The January-February 2025 inducement to stay with UNILEVER FCU by touting the new offices, continued services, and even the irrelevant/extraneous/gratuitous information about the company store, now appears to have been a misleading or inaccurate advertisement, prohibited by NCUA regulations.

Accordingly, we respectfully request Reclassification of accounts such that more/all deposits are insured by NCUA, as well as restoration of more/all our remaining funds, i.e. total amount of $259,625.28. Interest/Dividends are also warranted due to delays in receiving Initial Determination Funds (UNILEVER FCU was liquidated on 4/30/25 and funds not received until end of July).

## CONCLUSION

Granting this Request for Reconsideration will result in immediate relief without the further need of Board review under 12 CFR 746 and/or Judicial review under 12 CFR 745.202 and 12 USC 1787(d):

(1) Reinstatement of **Joint 20 and 22** based on UNILEVER FCU administrative record keeping errors. UNILEVER FCU non-compliance with required accurate Statements and records, giving out erroneous information while online information was missing, is a breach of fiduciary duty, resulting in harm, warranting reversal of the UNILEVER FCU mistaken transfer taking place in the unique period of turmoil just prior to liquidation;                    and/or

(2) Reclassification based on UNILEVER FCU failure to comply with our requested **goals of insurance.**

**On all the grounds expressed above, as well as fairness and equity and promotion of trust in the NCUA Insurance as an institution, we respectfully request that all of Our Own hard-earned remaining funds in the amount of $259,625.28, plus interest for undue delays, be returned to us.**

Respectfully submitted,
*Ellen Plotkin*

*Alexander Plotkin*
Ellen and Alex Plotkin

Attachments:
1. Email on or about January 29 - February 7, 2025 regarding errors caused by improper documentation and core processor system Errors (*New Evidence, Marked for Emphasis*).
2. Email of December 1, 2023 contemporaneous with the opening Share Certificate No. 37 expressing the goal to be covered by NCUA insurance (*Marked for Emphasis*).
3. Email of September 9, 2021 closing Share Certificate No. 24 and contemporaneous with opening a new Share Certificate account while expressing the goal to be covered by NCUA insurance (*New Evidence, not in Member file*).
4. Screen Shot of Share Certificate 37 record of February 10, 2025 printed by Beverly Lazzaro (*New Evidence, not in Member file – the last record received from UNILEVER FCU prior to liquidation*).

5

ATTACHMENT 1. (New Evidence)

From: **Alex Plotkin** alexpltkn@yahoo.com
Subject: Fwd: [External] - Re: CDs
Date: July 15, 2025 at 12:29 PM
To:



From: "Lazzaro, Beverly" <Beverly.Lazzaro@unilever.com>
Subject: Re: [External] - Re: CDs
Date: February 7, 2025 at 6:36:49 PM EST
To: Alex Plotkin <alexpltkn@yahoo.com>

Just saw the rest of message. Yes that is correct.

You are probably getting quarterly statements now. We switched core processor in October and if you do not have a checking account you will not receive a monthly statement.

Bev
Sent from my iPhone

On Feb 7, 2025, at 6:34 PM, Lazzaro, Beverly <Beverly.Lazzaro@unilever.com> wrote:

Hi

I believe you will have to wait until you get your next statement. I did put down in the nicknames the relationship of each. What I can do is take a snapshot for now of each one for you. Will that work for now?
Sent from my iPhone

On Feb 7, 2025, at 5:06 PM, Alex Plotkin <alexpltkn@yahoo.com> wrote:

Hi Bev,

Thank you again for the changes. I can see that CD20 was moved to CD37 and CD22 was moved to CD34.

Online I am unable to see details of CD ownership or details about the CD option:

Confusion Caused by Incorrect and Unavailable Account Statements, as well as lack of information online

ATTACHMENT 1 cont'd (New Evidence)

To confirm:  no penalty cd 5% 2 years with options to renew after 2 years and again another year at 5% or more if rates are higher then.

Also, I am only seeing the December 2024 eStatement and no other statements are available?

Please let me know your comments.

Many thanks,
Ellen

On Feb 7, 2025, at 12:22 PM, Lazzaro, Beverly <Beverly.Lazzaro@unilever.com> wrote:

Yes, I did.  Actually, did today!
  Have a nice day!!
  <image001.jpg>
  From: Alex Plotkin <alexpltkn@yahoo.com>
Sent: Friday, February 7, 2025 12:14 PM
To: Lazzaro, Beverly <Beverly.Lazzaro@unilever.com>
Subject: Re: [External] - Re: CDs
  Hi Bev
I have not had a chance to look online as we are traveling.
Have you had a chance to make the changes and arrange for documentation?
Many thanks
Ellen Plotkin
  Sent from my iThingy-pardon typos

On Jan 30, 2025, at 5:07 AM, Lazzaro, Beverly <Beverly.Lazzaro@unilever.com> wrote:
  Hi
  Yes, I can do that and move the 2 CD's as requested below. I will also give the CD's nicknames and that should appear on your next statement.  I will get this done by next week and email you back

**Confusion due to Incorrect December 2024 Statement**

~~email you back.~~
Have a great day.
Bev.
<image001.jpg>
From: Alex Plotkin <alexpltkn@yahoo.com>
Sent: Wednesday, January 29, 2025 8:23 PM
To: Lazzaro, Beverly <Beverly.Lazzaro@unilever.com>
Subject: Re: [External] - Re: CDs
Hi Bev,
Glad to hear all is good with you and that UFCU continues to do well!
Thanks for responding so promptly as always. I have a few concerns which are not urgent.

1. CD #35 should be solely in Alex's name based on my records. CD #37should be Solely Ellen POD Elan&Mark. This also plays into item 2.

**INSURANCE GOAL**

2. The Joint CDs 20, 21, 22, and 28 add up to over the FDIC limit. Would it be possible to move the amounts in CD22 into CD34 which is Joint POD Elan&Mark? Also move CD20 to CD37?

3. The Terms for all the CDs are with options as outlined in the messages below of October 30, 2023, although that information is not visible to us on the UFCU account or statements. Would it be possible to have some kind of documentation to that effect so that there is no confusion when time comes to exercise the options?
Many thanks,
Ellen


On Jan 29, 2025, at 6:10 PM, Lazzaro, Beverly <Beverly.Lazzaro@unilever.com> wrote:
Hi
All is good here and I hope you are doing well too.

**Advertisement/ Enticement/ Misleading?**

No worries, we are moving to the 800-building starting next week. We will have a nice office there and we also we be at Hoboken too. We will split our time between the two locations, but our main office will now be at 800. There will even be a company store. Once we get settled our days and times will be
~~posted on our website. Everything should be a smooth~~

Misleading-
3 Months To
Liquidation

Concern-
3 Months To
Liquidation

posted on our website. Everything should be a smooth transition for us and we can still continue to provide great service to you!

Bev.

<image001.jpg>

From: Alex Plotkin <alexpltkn@yahoo.com>
Sent: Wednesday, January 29, 2025 4:44 PM
To: Lazzaro, Beverly <Beverly.Lazzaro@unilever.com>
Subject: [External] - Re: CDs

Hi Beverly,

I hope all is well!

With Unilever moving to Hoboken, I was wondering how UFCU will be transitioning and how continuity will be handled with all the CDs we have deposited.

Please let me know your comments,

Many thanks,

Ellen Plotkin

From: Alex Plotkin <alexpltkn@yahoo.com>
Sent: Monday, October 30, 2023 10:35 AM
To: Lazzaro, Beverly <Beverly.Lazzaro@unilever.com>
Subject: Re: [External] - New CD

Also forgot to put in POD Elan Plotkin and Mark Plotkin. Brain retired 😊

Ellen Plotkin

Sent from my iThingy-pardon typos

On Oct 30, 2023, at 10:29 AM, Lazzaro, Beverly <Beverly.Lazzaro@unilever.com> wrote:

I can change it. No Worries!

<image001.jpg>

From: Alex Plotkin <alexpltkn@yahoo.com>
Sent: Monday, October 30, 2023 10:29 AM
To: Lazzaro, Beverly <Beverly.Lazzaro@unilever.com>
Subject: Fwd: [External] - New CD

Hi Bev

Filled out CD application but OOPS put in the wrong amount. The check I will deposit is for $312,733.00. Would you be able

to change or should we redo?
Thanks
   On Oct 30, 2023, at 7:47 AM, Lazzaro, Beverly
<Beverly.Lazzaro@unilever.com> wrote:

Yes that is correct. Have Jack deposit to your savings account.
Go to our website and complete a new Share Certificate
application. One I receive and mi ey is deposited I will set up
new CD.  The form is under the resources tab!

Sent from my iPhone

On Oct 30, 2023, at 7:44 AM, Alex Plotkin
<alexpltkn@yahoo.com> wrote:

Good morning Bev
Thank you for speaking with us and offering your advice.
I will be at 700 bldg for UFCU at 11:30am today.  I alone will
sign over the check made to Alex or me (assuming that's ok for
ufcu).
We decided to open a new cd in my name solely with POD to
both kids together so we get NCUA insurance up to 500k.
To confirm:  no penalty cd 5% 2 years with options to renew
after 2 years and again another year at 5% or more if rates are
higher then.
Many thanks
Ellen Plotkin

ATTACHMENT 2.  Insurance Goals

From: **Alex Plotkin** alexpltkn@yahoo.com 📎
Subject: Fwd: [External] - Fwd: CD No. 37 12-1-2023
Date: July 15, 2025 at 1:23 PM
To:



From: "Lazzaro, Beverly"
<Beverly.Lazzaro@unilever.com>
Subject: RE: [External] - Fwd: CD No. 37
Date: December 1, 2023 at 5:17:15 AM EST
To: Alex Plotkin <alexpltkn@yahoo.com>

Moring
 My apologies. I have corrected the maturity
date now on CD 37.  There is a memo on
the system that states this but will not show  ←
up on your statements.  The email
correspondence is also saved on your file.
 Bev.



**Beverly Lazzaro**
Member Service Supervisor
700 Sylvan Avenue
Englewood Cliffs, NJ 07632
 t:(203) 816-4041
 f:(973) 453-8334
www.unileverfcu.org

From: Alex Plotkin <alexpltkn@yahoo.com>
Sent: Friday, December 1, 2023 12:43 AM
To: Lazzaro, Beverly
<Beverly.Lazzaro@unilever.com>
Subject: [External] - Fwd: CD No. 37

Hi Beverly,

Sorry to bother you again so soon.  I just noticed on the new CD No. 37 the maturity date is listed in 2024.  We understood the first term is for 2 years (until 10/2025) with options for another 2 years and then another year.

By the way, the additional 3 option years do not show up online or on the Statements for all 9 CDs we currently hold - presumably the information is somewhere in your systems.

Please let me know your comments.

Many thanks,

Ellen


Begin forwarded message:

From: "Lazzaro, Beverly" <Beverly.Lazzaro@unilever.com>
Subject: RE: [External] - New CD
Date: October 30, 2023 at 3:19:57 PM EDT
To: Alex Plotkin <alexpltkn@yahoo.com>

You're welcome.

 Unilever
Federal Credit Union

**Beverly Lazzaro**
Member Service Supervisor



700 Sylvan Avenue
Englewood Cliffs, NJ 07632
T:(203) 816-4041
F:(973) 453-8334
www.unilever.com

From: Alex Plotkin <alexpltkn@yahoo.com>
Sent: Monday, October 30, 2023 3:04 PM
To: Lazzaro, Beverly <Beverly.Lazzaro@unilever.com>
Subject: Re: [External] - New CD
Thank you.
Ellen Plotkin
Sent from my iThingy-pardon typos


On Oct 30, 2023, at 1:16 PM, Lazzaro, Beverly <Beverly.Lazzaro@unilever.com> wrote:
You are all set.   <image001.jpg>
From: Alex Plotkin <alexpltkn@yahoo.com>
Sent: Monday, October 30, 2023 10:35 AM
To: Lazzaro, Beverly <Beverly.Lazzaro@unilever.com>
Subject: Re: [External] - New CD
Also forgot to put in POD Elan Plotkin and Mark Plotkin. Brain retired
Ellen Plotkin
Sent from my iThingy-pardon typos

Sent from my Phone pardon typos

On Oct 30, 2023, at 10:29 AM, Lazzaro, Beverly <Beverly.Lazzaro@unilever.com> wrote:

I can change it.  No Worries!
<image001.jpg>
From: Alex Plotkin <alexpltkn@yahoo.com>
Sent: Monday, October 30, 2023 10:29 AM
To: Lazzaro, Beverly <Beverly.Lazzaro@unilever.com>
Subject: Fwd: [External] - New CD
Hi Bev
Filled out CD application but OOPS put in the wrong amount.  The check I will deposit is for $312,733.00.  Would you be able to change or should we redo?
Thanks

On Oct 30, 2023, at 7:47 AM, Lazzaro, Beverly <Beverly.Lazzaro@unilever.com> wrote:

Yes that is correct. Have Jack deposit to your savings account. Go to our website and complete a new Share Certificate application. One I receive and mi ey is deposited I will set up new CD.  The form is under the resources tab!

Sent from my iPhone

On Oct 30, 2023, at 7:44 AM, Alex Plotkin <alexpltkn@yahoo.com> wrote:

Good morning Bev
Thank you for speaking with us and offering your advice.
I will be at 700 bldg for UFCU at 11:30am today.  I alone will sign over the check made to Alex or me (assuming that's ok for ufcu). We decided to open a new cd in my name solely with POD to both kids together so we get NCUA insurance up to 500k.
To confirm: no penalty cd 5% 2 years with

Stated Goal
NCUA
Insurance

To confirm. no penalty cd 5% 2 years with options to renew after 2 years and again another year at 5% or more if rates are higher then.
Many thanks
Ellen Plotkin

Sent from my iThingy-pardon typos

On Oct 25, 2023, at 5:54 PM, Lazzaro, Beverly <Beverly.Lazzaro@unilever.com> wrote:

Yes, that works for me.

-----Original Message-----
From: Alex Plotkin <alexpltkn@yahoo.com>
Sent: Wednesday, October 25, 2023 5:53 PM
To: Lazzaro, Beverly

&lt;Beverly.Lazzaro@unilever.com&gt;
Subject: Re: [External] - New CD

How about 1 pm?  Would you like to call us
at the number below?
Ellen Plotkin
551-298-2483
Sent from my iThingy-pardon typos

On Oct 25, 2023, at 5:49 PM, Lazzaro,
Beverly &lt;Beverly.Lazzaro@unilever.com&gt;
wrote:

Sure. Let me know when.

-----Original Message-----
From: Alex Plotkin &lt;alexpltkn@yahoo.com&gt;
Sent: Wednesday, October 25, 2023 4:20
PM
To: Lazzaro, Beverly

&lt;Beverly.Lazzaro@unilever.com&gt;
Subject: [External] - New CD

Hi Beverly
We have a new considerable sum and would like to ask several questions. Would it be possible to connect tomorrow afternoon to discuss?
Many thanks
Ellen Plotkin
551-298-2483
Sent from my iThingy-pardon typos
IMPORTANT NOTICE:  This email and any attachments may contain information that is confidential and privileged. It is intended to be received only by persons entitled to receive the information. If you are not the intended recipient, please delete it from your system and notify the sender. You should not copy it or use it for any purpose nor disclose or distribute its contents to any other person.

ATTACHMENT 3.  (New Evidence)

From: Alex Plotkin  alexpltkn@yahoo.com
Subject: Fwd: [External] - CD 9-9-2021
Date: July 15, 2025 at 1:28 PM
To:



> From: Alex Plotkin <alexpltkn@yahoo.com>
> Subject: Re: [External] - CD
> Date: September 9, 2021 at 11:22:50 AM EDT
> To: "Lazzaro, Beverly" <Beverly.Lazzaro@unilever.com>
>
> Thanks for the good idea regarding town hall!
>
> Please let me know if there are any specials around the time my CD matures on 9/25 or later.  When this CD matures, I will want to move the full amount to a new CD joint with Alex and POD to both sons Elan and Mark (to stay within NCUA insurance limits), and will send in additional funds.  I assume we will need to fill out a new CD application - will Alex and I both be able to Docusign from the same email account (same one I am emailing from)?

Stated Goal: NCUA Insurance

>
> On Sep 9, 2021, at 10:49 AM, Lazzaro, Beverly <Beverly.Lazzaro@unilever.com> wrote:
>
> No specials yet but we are hoping soon!
>
> We do notarize things but we are not in the office which would make this hard to do.  You may be better off going to your town hall.  Let me know.
>
> -----Original Message-----
> From: Alex Plotkin <alexpltkn@yahoo.com>
> Sent: Thursday, September 9, 2021 10:31 AM
> To: Lazzaro, Beverly <Beverly.Lazzaro@unilever.com>
> Subject: [External] - CD
>
> Hi Bev,
> Hope you are doing well!

Any chance you may have special CD rates?

Also, does UFCU notarize Wills?

Many thanks,
Ellen


CAUTION: This message was sent from outside the company. Please do not click links or open attachments unless you recognise the source of this email and know the content is safe.
IMPORTANT NOTICE:  This email and any attachments may contain information that is confidential and privileged. It is intended to be received only by persons entitled to receive the information. If you are not the intended recipient, please delete it from your system and notify the sender. You should not copy it or use it for any purpose nor disclose or distribute its contents to any other person.

ATTACHMENT 4

**From:** **BEVERLY LAZZARO** jackiedanc@me.com
**Subject:** [External] - Plotkin 37
**Date:** February 10, 2025 at 9:01 AM
**To:** Lazzaro, Beverly Beverly.Lazzaro@unilever.com



Wrong Number?

Wrong Maturity

Sent from my iPhone

Blank?

EXHIBIT E.   February 7, 2025 UFCU Email (Core System / Missing Ownership Information

From: **Alex Plotkin** alexpltkn@yahoo.com
Subject: Fwd: [External] - Re: CDs
Date: July 15, 2025 at 12:29 PM
To:



From: "Lazzaro, Beverly" <Beverly.Lazzaro@unilever.com>
Subject: Re: [External] - Re: CDs
Date: February 7, 2025 at 6:36:49 PM EST
To: Alex Plotkin <alexpltkn@yahoo.com>

Just saw the rest of message. Yes that is correct.

You are probably getting quarterly statements now. We switched core processor in October and if you do not have a checking account you will not receive a monthly statement.

Bev
Sent from my iPhone

On Feb 7, 2025, at 6:34 PM, Lazzaro, Beverly <Beverly.Lazzaro@unilever.com> wrote:

Hi

I believe you will have to wait until you get your next statement. I did put down in the nicknames the relationship of each. What I can do is take a snapshot for now of each one for you. Will that work for now?
Sent from my iPhone

On Feb 7, 2025, at 5:06 PM, Alex Plotkin <alexpltkn@yahoo.com> wrote:

Hi Bev,

Thank you again for the changes.  I can see that CD20 was moved to CD37 and CD22 was moved to CD34.

Online I am unable to see details of CD ownership or details about the CD option:

Confusion Caused by Incorrect and Unavailable Account Statements, as well as lack of information online

EXHIBIT E p. 2

To confirm:  no penalty cd 5% 2 years with options to renew after 2 years and again another year at 5% or more if rates are higher then.

Also, I am only seeing the December 2024 eStatement and no other statements are available?

Please let me know your comments.

Many thanks,
Ellen


On Feb 7, 2025, at 12:22 PM, Lazzaro, Beverly <Beverly.Lazzaro@unilever.com> wrote:

Yes, I did.  Actually, did today!
  Have a nice day!!
  <image001.jpg>
  From: Alex Plotkin <alexpltkn@yahoo.com>
Sent: Friday, February 7, 2025 12:14 PM
To: Lazzaro, Beverly <Beverly.Lazzaro@unilever.com>
Subject: Re: [External] - Re: CDs
  Hi Bev
I have not had a chance to look online as we are traveling.
Have you had a chance to make the changes and arrange for documentation?
Many thanks
Ellen Plotkin
  Sent from my iThingy-pardon typos


On Jan 30, 2025, at 5:07 AM, Lazzaro, Beverly <Beverly.Lazzaro@unilever.com> wrote:
  Hi
  Yes, I can do that and move the 2 CD's as requested below. I will also give the CD's nicknames and that should appear on your next statement.  I will get this done by next week and email you back

~~email you back.~~

Have a great day.
Bev.
<image001.jpg>
From: Alex Plotkin <alexpltkn@yahoo.com>
Sent: Wednesday, January 29, 2025 8:23 PM
To: Lazzaro, Beverly <Beverly.Lazzaro@unilever.com>
Subject: Re: [External] - Re: CDs
Hi Bev,
Glad to hear all is good with you and that UFCU continues to do well!
Thanks for responding so promptly as always. I have a few concerns which are not urgent.

1. CD #35 should be solely in Alex's name based on my records. CD #37should be Solely Ellen POD Elan&Mark. This also plays into item 2.

2. The Joint CDs 20, 21, 22, and 28 add up to over the FDIC limit. Would it be possible to move the amounts in CD22 into CD34 which is Joint POD Elan&Mark? Also move CD20 to CD37?

3. The Terms for all the CDs are with options as outlined in the messages below of October 30, 2023, although that information is not visible to us on the UFCU account or statements. Would it be possible to have some kind of documentation to that effect so that there is no confusion when time comes to exercise the options?

Many thanks,
Ellen


On Jan 29, 2025, at 6:10 PM, Lazzaro, Beverly <Beverly.Lazzaro@unilever.com> wrote:
Hi
All is good here and I hope you are doing well too.
No worries, we are moving to the 800-building starting next week. We will have a nice office there and we also we be at Hoboken too. We will split our time between the two locations, but our main office will now be at 800. There will even be a company store. Once we get settled our days and times will be

Confusion due to Incorrect December 2024 Statement

Advertisement/ Enticement/ Misleading?

**Margin annotations (right):**
INSURANCE GOAL

posted on our website. Everything should be a smooth transition for us and we can still continue to provide great service to you!

Bev.

<image001.jpg>

From: Alex Plotkin <alexpltkn@yahoo.com>
Sent: Wednesday, January 29, 2025 4:44 PM
To: Lazzaro, Beverly <Beverly.Lazzaro@unilever.com>
Subject: [External] - Re: CDs

Hi Beverly,

I hope all is well!

With Unilever moving to Hoboken, I was wondering how UFCU will be transitioning and how continuity will be handled with all the CDs we have deposited.

Please let me know your comments,

Many thanks,

Ellen Plotkin


From: Alex Plotkin <alexpltkn@yahoo.com>
Sent: Monday, October 30, 2023 10:35 AM
To: Lazzaro, Beverly <Beverly.Lazzaro@unilever.com>
Subject: Re: [External] - New CD

Also forgot to put in POD Elan Plotkin and Mark Plotkin. Brain retired 😉

Ellen Plotkin

Sent from my iThingy-pardon typos


On Oct 30, 2023, at 10:29 AM, Lazzaro, Beverly <Beverly.Lazzaro@unilever.com> wrote:

I can change it.  No Worries!

<image001.jpg>

From: Alex Plotkin <alexpltkn@yahoo.com>
Sent: Monday, October 30, 2023 10:29 AM
To: Lazzaro, Beverly <Beverly.Lazzaro@unilever.com>
Subject: Fwd: [External] - New CD

Hi Bev

Filled out CD application but OOPS put in the wrong amount. The check I will deposit is for $312,733.00.  Would you be able

to change or should we redo?
Thanks
  On Oct 30, 2023, at 7:47 AM, Lazzaro, Beverly
<Beverly.Lazzaro@unilever.com> wrote:

Yes that is correct. Have Jack deposit to your savings account.
Go to our website and complete a new Share Certificate
application. One I receive and mi ey is deposited I will set up
new CD.  The form is under the resources tab!

Sent from my iPhone

On Oct 30, 2023, at 7:44 AM, Alex Plotkin
<alexpltkn@yahoo.com> wrote:

DVISORY
ELATIONSHIP

Good morning Bev
Thank you for speaking with us and offering your advice.
I will be at 700 bldg for UFCU at 11:30am today.  I alone will
sign over the check made to Alex or me (assuming that's ok for
ufcu).
We decided to open a new cd in my name solely with POD to
both kids together so we get NCUA insurance up to 500k.
To confirm:  no penalty cd 5% 2 years with options to renew
after 2 years and again another year at 5% or more if rates are
higher then.
Many thanks
Ellen Plotkin

EXHIBIT F.  February 10, 2025 CD 37 System Screenshot

**From:** BEVERLY LAZZARO jackiedanc@me.com
**Subject:** [External] - Plotkin 37
**Date:** February 10, 2025 at 9:01 AM
**To:** Lazzaro, Beverly Beverly.Lazzaro@unilever.com





Wrong Number?

Wrong Maturity

Sent from my iPhone

Blank?

An official website of the United States government  Here's how you know

# OVERSIGHT.GOV
Brought to you by the Council of the Inspectors General on Integrity and Efficiency

# EXHIBIT G

Where to report fraud, waste, abuse, or retaliation    Log in

Reports    Investigations    CIGIE    FOIA    Newsroom    About    | Search

Home

# Semiannual Report to Congress (April 1, 2025 – September 30, 2025)

**View Report**

| | |
|---|---|
| **Date Issued** | Friday, November 21, 2025 |
| **Submitting OIG** | National Credit Union Administration OIG |
| **Agencies Reviewed/Investigated** | National Credit Union Administration |
| **Report Description** | National Credit Union Administration (NCUA) Office of Inspector General (OIG) Semiannual Report to the NCUA Board and the Congress highlighting our accomplishments and ongoing work for the 6-month period ending September 30, 2025. |
| **Report Type** | Semiannual Report |
| **SARC Start Date** | April 1, 2025 |
| **SARC End Date** | September 30, 2025 |
| **Agency Wide** | Yes |
| **Number of Recommendations** | 17 |
| **Questioned Costs** | $0 |
| **Funds for Better Use** | $0 |
| **Report updated under NDAA S274** | No |
| **External Link** | https://ncua.gov/files/oig/semiannual-report-congress-september-2025.pdf |



**National Credit Union Administration OIG**

Website

United States

Return to top

Sign up for CIGIE news and updates.    **Subscribe**



This is the official website of the Council of the Inspectors General on Integrity and Efficiency (CIGIE)

**Explore**
Contact Us
About
Budget & Performance

**Legal**
Privacy Policy
Accessibility
No FEAR Act
FOIA

DATA.GOV    USASPENDING.gov

USA.gov     Pandemic Oversight

 An official website of the United States government   Here's how you know

 **EXHIBIT G**

Home

## National Credit Union Administration

Source Id
329

## NCUA 2025 Financial Statement Audits for Share Insurance Fund, Operating Fund, Central Liquidity Facility, Community Development Revolving Loan Fund
02/13/2026
2026
OIG-26-01/02/03/04
Audit
National Credit Union Administration OIG
National Credit Union Administration

KPMG LLP's (KPMG) report on its financial statement audit of the National Credit Union Administration's (NCUA) financial statements, which includes the Share Insurance Fund, the Operating Fund, the Central Liquidity Facility, and the Community Development Revolving Loan Fund, as of and for the year...

Read more

## Audit of the NCUA's Information Technology Asset Sanitization Process
12/17/2025
2026
OIG-25-10
Audit
National Credit Union Administration OIG
National Credit Union Administration

3/28/26, 11:27 PM                                    National Credit Union Administration | Oversight.gov

Read more

## Semiannual Report to Congress (April 1, 2025 - September 30, 2025)

11/21/2025
2025
Semiannual Report
National Credit Union Administration OIG
National Credit Union Administration

National Credit Union Administration (NCUA) Office of Inspector General (OIG) Semiannual Report to the NCUA Board and the Congress highlighting our accomplishments and ongoing work for the 6-month period ending September 30, 2025.

Read more

## Audit of the NCUA's Schedule of Accounts Receivable, Net (Other Than Intragovernmental) and Other Taxes and Receipts as of and for the Period Ended September 30, 2025

11/14/2025
2026
OIG-25-09
Audit
National Credit Union Administration OIG
National Credit Union Administration

Under a contract monitored by the OIG, KPMG, an independent certified public accounting firm, performed an audit of the NCUA's schedule of accounts receivable, net (other than intragovernmental) and other taxes and receipts as of and for the period ended September 30, 2025. KPMG conducted the audit...

Read more

## National Credit Union Administration Federal Information Security Modernization Act of 2014 Audit - Fiscal Year 2025

08/20/2025
2025
OIG-25-08
Audit
National Credit Union Administration OIG
National Credit Union Administration

This report summarizes the results of Sikich's independent evaluation and contains ten new recommendations that will assist the agency in improving the effectiveness of its information security and its privacy programs and practices. NCUA management concurred with and has



# NCUA
National Credit Union Administration

## OFFICE OF INSPECTOR GENERAL

## EXHIBIT G



# Semiannual Report to Congress

### April 1, 2025 – September 30, 2025

OIG Semiannual Report to the Congress

*April 1, 2025 - September 30, 2025*



# Table of Contents

A Message from the Inspector General........................................................................................ 1

The National Credit Union Administration Mission.................................................................. 2

Introduction................................................................................................................................ 3

Federally Insured Credit Union Highlights................................................................................ 5

Legislative Highlights................................................................................................................ 7

Office of Inspector General........................................................................................................ 8

Audit Activity............................................................................................................................. 9

Peer Reviews............................................................................................................................ 22

Investigative Activity............................................................................................................... 23

Reviews of Legislation, Regulations, and Policies................................................................. 26

Table I : Issued Reports With Questioned Costs..................................................................... 27

Table II: Issued Reports with Recommendations that Funds Be Put To Better Use.............. 28

Table III: Summary Of OIG Audit Activity during the Reporting Period .............................. 28

Table IV: Summary Of OIG Audits In Progress ..................................................................... 28

Index of Reporting Requirements............................................................................................ 29

APPENDICES:

    A. System Review Report (Peer Review of NCUA OIG) ...................................................... 31

i

OIG Semiannual Report to the Congress



*April 1, 2025 · September 30, 2025*

# A Message from the Inspector General

On behalf of the Office of Inspector General (OIG) of the National Credit Union Administration (NCUA), I am pleased to present our Semiannual Report to Congress highlighting our accomplishments and ongoing work for the 6-month period ending September 30, 2025. Our work reflects the legislative mandate of the Inspector General Act to promote the economy, efficiency, and effectiveness of NCUA programs and operations, and protect against fraud, waste, and abuse. The audits and investigations highlighted in this report demonstrate our commitment to that mandate. We issued an audit report on the NCUA's Cyber Threat Information Sharing, which is described later in this report. We continued to work on five investigations opened in prior periods with three different U.S. Attorney's Offices.

The NCUA Board and management were responsive to all OIG recommendations and identified actions to timely implement them. I greatly appreciate the support for our office by the Board and management, including since I became Acting Inspector General in May. I hope that the OIG's audits, investigations, and other work may assist the Board and management in their efforts to streamline the agency while ensuring its continued effectiveness in carrying out its mission and operations.

MARTA ERCEG

Digitally signed by
MARTA ERCEG
Date: 2025.10.22
12:36:37 -04'00'



Marta Erceg
Acting Inspector General

OIG Semiannual Report to the Congress



*April 1, 2025 - September 30, 2025*

objectives and performance goals, they must identify, measure, and assess risks related to mission delivery.

The NCUA is exposed to a variety of risks related to its mission and operations, including in its regulation and supervision of over 4,000 federally insured credit unions. Through its ERM program, the agency expects to manage risks to achieving its mission and maximizing opportunities. ERM should address the full spectrum of risks related to achieving the NCUA's strategic objectives and provide agency leadership a complete view of risk to help inform decision making.

We are conducting this self-initiated audit to determine whether the NCUA adequately established, maintained, and used risk profiles to address enterprise-level risks.

### Material Loss Reviews (MLR)

The Federal Credit Union Act requires the OIG to conduct an MLR of an insured credit union if the loss to the Share Insurance Fund exceeds $25 million and an amount equal to 10 percent of the total assets of the credit union at the time in which the NCUA Board initiated assistance or was appointed liquidating agent pursuant to the Act. When losses exceed this materiality threshold, we review the loss to: (1) determine the cause(s) of the credit union's failure and the resulting loss to the Share Insurance Fund; and (2) assess the NCUA's supervision of the credit union. During this reporting period, the Share Insurance Fund had no losses exceeding the materiality threshold.

### Report on Credit Union Non-Material Losses

For any loss to the Share Insurance Fund that does not meet the threshold, the Federal Credit Union Act requires the OIG to conduct a limited-scope review to determine whether unusual circumstances exist related to the loss that would warrant conducting a full-scope MLR. For the current reporting period, the Share Insurance Fund incurred a loss below the threshold due to six failed credit unions. We conducted a limited-scope review on the failed credit unions. For each limited-scope review, we performed procedures that included: (1) obtaining and analyzing the regulator's supervisory memoranda and other pertinent documents; (2) preparing a schedule of CAMELS ratings assigned to the institution through full scope or other examinations during the 5 years preceding the failure; (3) conducting interviews as needed; (4) inquiring about any investigative actions taken, planned, or considered involving credit union officials or others; and (5) analyzing supervisory history and other review methods. Based on our reviews, we determined none of the losses involved unusual circumstances warranting conducting a full-

OIG Semiannual Report to the Congress

*April 1, 2025 - September 30, 2025*

scope MLR. The following chart provides details on the six credit unions and our decision not to conduct further work.

| | OIG'S DECISION REGARDING LOSSES LESS THAN $25 MILLION | | | | |
|---|---|---|---|---|---|
| OIG Decision | Credit Union | Region | Liquidation Date | Est. Loss to Share Insurance Fund | Grounds for Liquidation or Appointment |
| Terminate | Unilever Federal Credit Union (Unilever) | Eastern | 4/30/2025 | $8,440,000 | Unilever was involuntarily liquidated due to fraud. Two credit union employees hid borrowings and used them to conceal their fraudulent activity and mask the credit union's true liquidity position. |
| Terminate | Eastern Kentucky Federal Credit Union (Eastern Kentucky) | Southern | 6/5/2025 | $1,471,759 | Eastern Kentucky merged with Commonwealth Federal Credit Union with a cash assistance. Eastern Kentucky failed due to management's lack of follow-up and detailed knowledge of its loan portfolio. |
| Terminate | Soul Community Federal Credit Union (Soul Community) | Southern | 6/20/2025 | $91,425 | Soul Community was involuntarily liquidated due to insolvency, violations of the Federal Credit Union Act and NCUA rules and regulations, and because it operated in an unsafe and unsound manner. |
| Terminate | Butler Heritage Federal Credit Union (Butler Heritage) | Southern | 6/30/2025 | $192,525 | Butler Heritage was liquidated with a purchase and assumption by Cincinnati Ohio Police Federal Credit Union. Butler Heritage failed due to mismanagement that resulted in continued financial losses and failure to comply with record keeping, Bank Secrecy Act, and information technology requirements. |



*April 1, 2025 - September 30, 2025*

| Terminate | Aldersgate Federal Credit Union (Aldersgate) | Western | 7/1/2025 | $7,975,902 | Aldersgate was involuntarily liquidated due to insolvency related to management's fraudulent activities involving multiple loans and share accounts. |
|---|---|---|---|---|---|
| Terminate | Members First of Maryland Federal Credit Union (Members First) | Eastern | 8/29/2025 | $230,520 | Members First was liquidated with a purchase and assumption by Aberdeen Proving Ground Federal Credit Union. Members First failed because of pervasive record weaknesses, deficient earnings, elevated operating expenses, and declining net worth. |

# EXHIBIT H

 National Credit Union Administration
Asset Management & Assistance Center

## Uninsured Shares Reconsideration Determination

September 19, 2025

SENT BY MAIL AND EMAIL

Ellen Plotkin
Alexander Plotkin
43 Saxonia Avenue
Wyckoff, NJ 07418

Dear Mr. and Mrs. Plotkin:

RE: Unilever Federal Credit Union

We have received your request for reconsideration regarding your account at Unilever Federal Credit Union. After careful review, we regret to inform you that we are unable to revise our initial share insurance determination due to insufficient supporting documentation.

You requested that Certificates of Deposit (CD) 20 and 22 be restored as joint owner accounts without Payable-on-Death (POD) designations. However, in your email dated January 29, 2025, you explicitly instructed the credit union to move the funds from CD 20 to CD 37 and from CD 22 to CD 34. This is the most recent directive we have on file regarding these accounts, and therefore, we are unable to alter the ownership structure at this time.

Additionally, you asked us to reclassify the remaining uninsured share balance based on the credit union's alleged failure to fulfill your request to ensure all accounts were fully insured. While we understand this was your goal, reclassification of shares after liquidation cannot be completed without adequate documentation supporting such a change.

As such, our original share insurance determination stands. The uninsured balance in your account, as of the date of liquidation remains $259,625.28

An explanation of your right to appeal a determination by the liquidating agent is enclosed. You may also find detailed information regarding NCUA's appeals regulation at 12 C.F.R. Part 746, Subpart B.

10910 Domain Drive, Suite 200 – Austin, TX 78758
512-231-7900

Ellen Plotkin
Alexander Plotkin
September 19, 2025
Page 2

If you have any questions, please contact our office by phone at (512) 231-7940 or by email at AMACmail@ncua.gov.

Sincerely,

Cory Phariss
Liquidating Agent

AMAC/LDY:FMM
DLMS-CL-005
FCU 05736-2618
Enclosures (1)

# EXHIBIT I.  Appeal to the NCUA Board

Ellen and Alexander Plotkin
43 Saxonia Avenue
Wyckoff NJ 07481
alexpltkn@yahoo.com
551-298-2483

November 12, 2025

VIA UPS Courier

Secretary of the Board
National Credit Union Administration
1775 Duke Street
Alexandria VA 22314-3428

Re:   UNILEVER Federal Credit Union ("UNILEVER FCU") -- Charter No. 5736-- Accounts 11596
**APPEAL** to NCUA Board from AMAC/Liquidating Agent Reconsideration Denial Determination

We hereby Appeal to the NCUA Board under 12 CFR §746, Subpart B, including §746.204.
UNILEVER FCU was suddenly and surprisingly to us, Members, liquidated on April 30, 2025.  AMAC
did not issue an Initial Determination until July 24.  AMAC found Uninsured **$259,625.28** of our life's
earnings and savings.  On August 21, 2025, we submitted a Request for Reconsideration ("RR")
(incorporated by reference herein together with all the evidence submitted and of record).  Additional
Insured Funds are warranted as we object to AMAC failure to fully consider UNILEVER FCU errors
when they denied our RR in their determination of September 19, 2025. We also appeal based
NCUA errors in supervision of UNILEVER FCU.  Liquidation and damages could have been avoided
had NCUA properly supervised financial health and record keeping compliance of UNILEVER FCU.

## EXECUTIVE SUMMARY

NCUA has a duty to supervise and regulate credit unions.  By virtue of the abrupt liquidation
of UNILEVER FCU, without attempts for merger or conservatorship, the NCUA effectively
confiscated Member uninsured deposits.  The sudden liquidation signals that NCUA did not properly
supervise and regulate UNILEVER FCU.  For example, the NCUA failed to see that the Sponsor
Unilever US, Inc. move to Hoboken, accompanied by massive lay-offs, was eroding UNILEVER FCU
Membership.  As such, the NCUA allowed UNILEVER FCU to continue to take or maintain Member
deposits.  NCUA also failed to supervise record keeping compliance of UNILEVER FCU.  With the
liquidation, our deposits disappeared into the Insurance Fund, to be touted by the NCUA as growing
while keeping quiet that it is at the expense of Members who lost hard-earned money. NCUA Board
should remedy NCUA failure to supervise through restitution/protection all of our Member deposits.

NCUA has a policy of member protection and trust in the credit union system.  Member
protection here would be NCUA Board ordering what AMAC erred in not doing, i.e. the reversal of an
oversight and mistake which occurred as a result of UNILEVER FCU record keeping compliance
failures in their regular course of business and particularly, uniquely, less than 3 months to
liquidation, at a turbulent time of instability when UNILEVER FCU was undergoing core processor
changes.  The oversight was directly caused by UNILEVER FCU failure to keep proper records:
incorrect changed Statements; incomplete and incorrect online Records.  The unique circumstances
should be considered in their entirety.  Our long-standing Joint insured accounts 20 and 22, on
which insurance premiums have been paid all along, were mistakenly transferred to uninsured POD.
AMAC looked for the transfer request in the email of January 29, 2025, but ignored simultaneously
expressed concerns about:  Insurance, UNILEVER FCU viability, incorrect statements, missing
online information, and absence of notice and disclosure.  Viewing the correspondence as a whole,
the reasoning for the directive was that joint accounts exceeded insured amounts (based on the

incorrect records) but both UNILEVER FCU and AMAC ignored that part of the email. We appeal to the Board to consider the circumstances as a whole and exercise its authority to reverse the transfer error due to the oversight, offer us member protection and grant additional insured funds of at least **$87,643.46**. This error is unique as it occurred in this period of apparent preparation for liquidation and core processor changes. Therefore, NCUA Board correction of the mistake by reinstating the Joint accounts 20 and 22 would not be precedential. This is simply a correction of an oversight and mistake. The NCUA Board has an opportunity here to restore our trust in the credit union system.

Member protection should be the overriding NCUA concern. The intent behind the NCUA statutes, regulations, and trust in Insurance is to boost credit union business by encouraging Shareholders to invest more with different types of account categories. Therefore, to the extent **Shareholders specifically wanted/requested to have NCUA insurance**, they should have it by proper classification and/or re-classification of accounts where possible. On the other hand, if Shareholders had wanted to invest more than what is covered under NCUA insurance and took on that risk, then they may be left uninsured. Here, Members specifically requested and acted with the **specific goal of NCUA insurance** (that goal was overriding over the POD designations).

We appeal to the NCUA Board to offer us member protection and restore trust with restitution to us Members.

### (1) STATEMENT OF FACTS

More than 20 years ago, we joined our employee credit union, garnering the trust of its members under the Sponsorship of the billion-dollar international consumer products giant Unilever US, Inc. We believed that keeping cash in this large trusted company institution, with the added comfort of NCUA Insurance, was a safe investment for our family future.

Accounts No. 20 and 22 were long-standing Joint accounts according to the Membership file, of record. Joint Account No. 20 was opened in 2009 and Joint Account No. 22 was opened in 2018.

As insured joint accounts, premiums on these accounts have been paid into the Insurance Fund all along for many years, per 12 U.S.C. § 1781.

Both accounts were held as fully insured under 12 C.F.R. § 745.8 until the transfer error on February 7, 2025, caused by UNILEVER FCU failure to keep records and change of core processor, with less than three (3) months remaining to the date of liquidation. See Attachment 1 (emails).

UNILEVER FCU did not provide notice of switching to quarterly statements beginning October 2024.

After switching to quarterly statements, UNILEVER FCU provided an incorrect Statement as to ownership of accounts and was missing the ownership information on Member online access. Historical statements up to and including the monthly Statement of September 2024 accurately reflected account ownership/title/classifications. Beginning with the quarterly statement of October - December 2024, the account statement inaccurately reflected account ownership/title/classifications. See Attachments 2 and 3 (Statements). For example, while previous statements showed account **37** as POD, the October-December 2024 Statement incorrectly showed Individual ownership.

The Statements were and at least up to the date of liquidation remained incorrect as to account classification even after UNILEVER FCU personnel acknowledged/admitted in January 2025 that errors were due to their changing core processor systems. For example, the later statements continued to fail to show Accounts 28 and 36 as POD. The March 2025 Statement remained incorrect, as did the April and May statements provided by AMAC.

In the January 29, 2025 email to UNILEVER FCU Supervisor, Attachment 1, Member expressed:
- concern about the transition and continuity /viability of UNILEVER FCU with the upcoming Sponsor Unilever US, Inc. move to Hoboken;
- concern (by way of oversight) that the joint accounts exceeded NCUA Insurance limits based on incorrect October–December 2024 Statement, showing incorrect account

title/ownership, different from previous statements; by way of oversight based on the incorrect Statement, I listed account 28 as joint; Services Supervisor failed to correct; Oversight was directly caused by UNILEVER FCU failure to keep proper records;
- concern about the lack of account ownership information on the online access system; Oversight was directly caused by UNILEVER FCU failure to keep proper online records;
- request to correct ownership record for accounts 35 as Individual and 37 as POD;
- oversight: based on incorrect and lacking UNILEVER FCU information, a request to UNILEVER FCU professional (Member Services Supervisor) to move funds from joint accounts 20 and 22 to POD – ironically, we expressly stated it was to maintain insurance (Supervisor should have known better, had a fiduciary duty; AMAC ignored this part).

In reply to my requests, on February 7, Supervisor admitted the Statement was incorrect due to core processor changes and offered to correct with the next statement, as well as to correct some of the lack of online information. Supervisor also made (mis)representations regarding the "smooth transition" and continuation of UNILEVER FCU post move to Hoboken, touted dual location and continued "great service," and even advertised additional services not relevant to UNILEVER FCU.

On February 7, Supervisor made the transfer, with complete disregard to insurance reasons for the mistaken directive which was made in reliance on inaccurate Statement. No form relating to transmittal of funds completed or signed by us accompanied the transaction. This was a blatant error of shifting funds from insured to uninsured caused by UNILEVER FCU record compliance failures and lack of care in violation of fiduciary duties and contrary to Bylaws. The mistake occurred less than 3 months to liquidation, during the turbulent and disruptive pre-liquidation period and core processor changes. This transfer mistake is akin to "trade error", usually simply corrected.

An example of continued failure to comply with record keeping requirements which led to confusion and the mistake is that: The Screen Shot of the Share Certificate 37 record of February 10, 2025 (*Attachment 4*) remained wrong even after correction by Member Services Supervisor:
- "Pay on Death" line at the bottom is blank; and
- The "Last CAN" field contains an account number that is not recognizable as ours; and
- The Maturity Date is wrong in violation of the Truth in Lending requirement (24 month share certificate should mature on 10/30/2025).

Account 28 and 36 titles/ownership information remained incorrect on following statements.

We were among the largest Shareholders in UNILEVER FCU and regularly consulted with the Member Services Supervisor, who coordinated with CEO Jim Kopfensteiner, regarding additional investments based on insurance considerations. We saw Jim and Beverly regularly in our workplace offices under corporate integration including use of the @*unilever.com* email system. With this 20+ year trust and reliance relationship and a large deposit of funds in an employer integrated institution, UNILEVER FCU had enhanced fiduciary duty, not just an ordinary banking relationship, thereby requiring a duty of care beyond ordinary. Nevertheless, they never provided notice of our uninsured funds nor took care with the mistaken transfer. See attachments; Correspondence file of record.

Aggregation of the Joint Account Nos. 20 and 22 with the other Joint Account Nos. 21 and 29 gives a total Insured Joint account amount of about **$483,377.61** (fully Insured Amount, under the limit of $500,000). After restoration of accounts 20 and 22, on which premiums have been paid into the Insurance Fund, the difference between the Initially Determined uninsured amount of **$259,625.28** and the recalculated Uninsured amount of **$171,981.82** is: **$87,643.46**. See RR.

NCUA response to our FOIA request 2025-FOIA-307 was inadequate and incomplete subsequent to delay tactics. Likely this appeal could be supplemented with additional facts, and we reserve our rights pending FOIA appeal. Pursuant to 12 CFR §746.206(a), in the Administration of an appeal, Special Counsel shall contact the relevant NCUA program office and request:
> "a complete set of pertinent materials, including internal memoranda, correspondence, and records having a bearing on the initial agency determination ..."

While not received with our FOIA request, these documents, together with the AMAC Member and Correspondence files, are incorporated by reference herein as available to the Board.

3

### (2) <u>STATEMENT OF BASIS FOR OBJECTION TO INITIAL DETERMINATION</u>:
We appeal to the NCUA Board to correct errors of the NCUA and AMAC:

### A. <u>NCUA Failed to Supervise and Protect Members; Board Should Correct with Restitution</u>
Institutional accountability is required to correct NCUA failure to supervise. Liquidation could have been avoided had NCUA properly supervised the financial health and record keeping compliance of UNILEVER FCU. <u>NCUA failed in its duty to supervise</u> and regulate credit unions and we appeal to the NCUA Board to correct with restitution to us. 12 U.S.C. § 1781(a) provides: "The <u>Board</u> ... shall insure the member accounts of all <u>Federal credit unions</u>..." Credit unions pay premiums on insurance provided by the NCUA and pay costs of examinations; NCUA is supposed to conduct regular examinations in its oversight role, to make sure credit unions operate in safe and sound financial condition and that they have adequate reserves. <u>See</u> 12 U.S.C. § 1781(b). The fact that UNILEVER FCU had to be suddenly liquidated signals the lack of proper supervision by NCUA in years and months leading up to liquidation. Abrupt liquidation, of UFCU without attempts for merger or conservatorship, by virtue of itself, resulted in effective confiscation of Member deposits.

NCUA failed to see that Sponsor's Unilever US, Inc. move to Hoboken, accompanied by massive lay-offs, was eroding Membership. NCUA allowed UNILEVER FCU to maintain a facade of ongoing business and continue to take or maintain Member deposits, eventually lost with the liquidation, contrary to <u>Bylaws</u> which state the purpose of affording members "an opportunity for accumulating their savings." The Insurance Fund should not be growing at the expense of <u>NCUA's lapse</u> in supervision and regulation of UNILEVER FCU for safety and soundness (by allowing high expenses and oversight lapses). Board should remedy-- through restitution/protection of deposits.

Even we as Members expressed concern as to what would happen to UNILEVER FCU in light of the upcoming move to Hoboken. <u>See</u> email of January 29, asking Supervisor what will happen to UNILEVER FCU after the imminent move. NCUA allowed UNILEVER FCU to continue to operate and make representations regarding the continuation of UNILEVER FCU post move to Hoboken. These misrepresentations induced us to continue our deposits with UNILEVER FCU. Shown in *Attachment 1* is how UNILEVER Member Services Supervisor advertised the well-being of the UNILEVER FCU during a period of disruption-e.g. core processor, in the lead up to liquidation. The (mis)representations made Member comfortable maintaining funds with UNILEVER FCU. This advertisement of services/enticement occurred less than three (3) months to liquidation. The January-February 2025 inducement to stay with UNILEVER FCU by touting the new offices, continued services, and even the irrelevant/extraneous/gratuitous information about the company store, now appears to have been a misleading or inaccurate advertisement, prohibited by NCUA regulations. <u>See</u> 12 CFR §707.8(a).

Furthermore, according to UnitedCreditorsConnect.com on or about June 2025, the failure of UNILEVER FCU was (emphasis added):

> driven by mounting financial troubles and mismanagement at the credit union. In recent years, Unilever FCU racked up steep losses and an unsustainable cost structure. It reported a net loss of $134,891 at the end of 2023, followed by a deeper loss of $336,490 in 2024. An examination of its finances revealed an alarmingly high expense ratio – an 88% operating efficiency ratio, far worse than peer institutions. The salaries and benefits for its five employees averaged $140,000 each, nearly double the typical pay at similar-sized credit unions. These figures suggest that the credit union was overextending on overhead relative to its income, eroding its capital. In fact, regulators simultaneously issued prohibition orders against two Unilever FCU employees, banning them from working in any federally insured financial institution. This severe step indicates there may have been <u>wrongdoing or unsafe practices</u> contributing to the credit union's downfall...

All the while, NCUA failed to supervise and allowed UNILEVER FCU to <u>fail</u> to carry out the <u>cooperative</u> purpose of a Federal credit union. UNILEVER FCU never provided us:

4

(i) notice of our right to be involved in the credit union governance and/or to participate or receive minutes of Board meetings per the Bylaws Article V or Article VI Section 7 (Minutes also withheld in our FOIA request); (ii) notice of Elections, contrary to Article VI of Bylaws; (iii) "a written report on the condition and affairs of this credit union" contrary to Article X, Section 3 of Bylaws; (iv) notice of switching to quarterly statements beginning October 2024. As no information or notice was provided by UNILEVER FCU and their professionals over a 20+ year consultation relationship, the lack of informed consent to uninsured account funds is a violation of Members' rights to due process. NCUA allowed UNILEVER FCU to omit material facts. This lack of transparency/ misrepresentation is contrary to the 12 U.S.C. § 1752(1) definition of a credit union as a "cooperative association."

NCUA has a policy of member protection and trust in the credit union system. Member protection here would be NCUA Board ordering restoration of our long-standing Joint accounts 20 and 22, which were mistakenly transferred to POD less than 3 months to liquidation, at a turbulent time of instability when UNILEVER FCU was undergoing core processor changes. See Statement of Facts above. NCUA allowed UNILEVER FCU to betray our trust and breach their fiduciary duty. We entrusted what we earned through hard work to our workplace integrated credit union institution under the corporate sponsorship of consumer products giant Unilever US, Inc., under protection of the NCUA, for at least 20+ years that we sat in the same offices with Jim and Beverly. Regular consultations regarding NCUA Insurance created enhanced institutional trust and reliance, while requiring superior standard of care of Credit Union institution to us Members. See e.g. Attachment 1 regarding advice asked and given. Unfortunately, while UNILEVER FCU staff were aware of the correct aggregate amounts in the Joint accounts and in the POD accounts, they failed to properly advise on our insurance request, which constitutes gross negligence and violation of their fiduciary duty which was the greater duty of care under 12 U.S.C. § 1787(h). See Attachment 1, Emails.

As Member protection should be the overriding NCUA concern, and for all the reasons stated above, we appeal to the NCUA Board grant restitution to us Members as a way to: (i) correct its supervision and oversight role failures; and (ii) offer us member protection and restore trust. We request that the NCUA Board exercise its authority to offer member protection by granting additional insured funds of at least **$87,643.46** based on correctable mistake/transfer error on accounts 20 and 22. The NCUA Board has an opportunity here to restore our trust in the federal credit union system.

## B.    Board Should Consider the Totality of the Record in Full Context;
## And Reverse Correctable Transfer Error Caused by UNILEVER FCU Recordkeeping Failures

This is an appeal to NCUA Board to consider evidence in a way AMAC failed to do when it issued a Determination without accounting for the totality of January 29 directive and February 7 correspondence and the recordkeeping failures that precipitated the erroneous transfer. Inaccurate and incomplete records, caused in part by core processor changes, less than 3 months to liquidation must be considered as a whole to lead up to the emails for the full context. See Attachment 1. Members' January 29 email explicitly sought corrections and rebalancing to remain fully insured.

Recordkeeping compliance failure leading to mistakes warrants restoration of Joint Accounts by NCUA Board. Credit Unions are required to maintain adequate and accurate records of account ownership and insurance coverage. The reason for such duty on a depository institution is to avoid precisely the type of confusion that occurred here due to UNILEVER FCU neglect to maintain documentation and review for accuracy and completeness. Errors continued during and as a result of core processor/system conversion shortly prior to liquidation. We as members faced a lack of accurate and consistent records. The only record sent by UNILEVER FCU after the "blind" funds shift, the screenshot of account **37**, exacerbates UNILEVER FCU lack of accurate member-facing records as evidence that the account was not properly documented. See Facts Statement above. UNILEVER FCU did not in good faith hold these accounts as properly titled in the regular course of business contrary to 12 C.F.R. 745.2(c). Moreover, the shift of funds from insured joint to uninsured POD was not accompanied by "form relating to the transmittal of funds that is completed or signed

by the person placing the transmittal order." <u>Correspondence, viewed as a whole, proves that error was caused by UNILEVER FCU failure to administer accurate records and systems</u>. Therefore, the undocumented move of the funds to the POD accounts should be reversed. Joint accounts 20 and 22 should be reinstated by reversing the mistaken transfer, resulting in lower aggregate POD funds, warranting return of additional insured funds.

We ask the NCUA Board to consider the record as a whole and not just pick and choose the isolated language requesting transfer apart from context. UNILEVER FCU provided incorrect October – December 2024 and January – March 2025 Statements. While historical statements showed correct account ownership classifications up to and including September 2024, the following Statements were and at least up to the date of liquidation <u>remained incorrect</u> as to account classification even after UNILEVER FCU personnel acknowledged/admitted in January 2025 that errors were due to their changing core processor systems. For example, the statements continued to fail to show Accounts 28 and 36 as POD. Lack of online access to information exacerbated the confusion. The discrepancy in the statements with missing POD designations caused me the oversight to view the joint accounts as exceeding insured limits and to ask for rebalancing of the accounts (mistakenly listing account 28 as joint). UNILEVER FCU had better data on their end and had a fiduciary duty in *good faith* to know better. Had UNILEVER FCU member facing records been correct, they would have shown us that the aggregate Joint accounts were fully insured. Nevertheless, UNILEVER FCU shifted insured Joint funds to uninsured POD accounts <u>less than three (3) months to the date of liquidation</u>, during a period of disruption due at least in part by core processor conversion, while share certificates 20 and 22 were long-standing Joint Accounts. As such, premiums on these accounts have been paid into the Insurance Fund all along, per 12 U.S.C. § 1781. The unique circumstances around the transfer mistake should be considered in their entirety, including insurance concerns, record keeping errors which caused an oversight and fiduciary duty violations, not just picking and choosing the terms transfer. This oversight error/mistake should be reversed with reinstatement of the joint accounts 20, 22.

The NCUA Board should recognize the breach of fiduciary duty that allowed the mistaken transfer and grant us restitution. UNILEVER FCU neglect of its enhanced duty of care with the advisory relationship and violation of its fiduciary duties adds to the full context weighing in favor of member-protective correction. Under 12 C.F.R. § 701.4(a) and (b)(1), each Federal credit union director, while being able to delegate (thus extending to the organization), has the duty to:

> Carry out his or her duties as a director in <u>good faith</u>, in a manner such director reasonably believes to be in the <u>best interests of the membership</u> of the Federal credit union as a whole, and with the care, including reasonable inquiry …;

Had they acted with care and reasonable inquiry, the Member Services Supervisor should <u>not</u> have made the mistaken transfer of insured funds to uninsured. Had UNILEVER FCU exercised its fiduciary duty, Member interests would have been placed above its own preservation. As an employee credit union, with co-located office personnel, garnering the trust of its members, UNILEVER FCU should have verified and advised that the account structure leaves uninsured funds. Acting in *good faith*, notice of uninsured funds would have been appropriate. UNILEVER FCU failure to do so exhibits breach of trust and/or negligence and/or breach of fiduciary duty and/or <u>omission of material fact</u>. The move of insured Joint Funds to POD was not only erroneous, but reckless disregard on the part of UNILEVER FCU. In any event, UNILEVER FCU personnel would have known that there were uninsured funds, as they were paying premiums/dues to the NCUA Insurance Fund based only on the insured amounts. NCUA Board decision in *Federal Credit Union,* NCUA Docket BD-99-02 (Feb. 24, 1999) authorizes the NCUA Board to reclassify accounts by administrative correction of credit union lapses. Like *Espirito Santo,* UNILEVER FCU suffered from professional service failures and shareholder/member protection violations. UNILEVER FCU "failure appears to have been driven by mounting financial troubles and **mismanagement**," according to *unitedcreditorsconnect.com.*

6

UNILEVER FCU violation of 12 U.S.C. § 4301 et seq.: Truth in Savings Act further supports correction and restitution. On Jan. 29, regarding continuity, Supervisor made (mis)representations regarding the continuation/transition of UNILEVER FCU post move to Hoboken. UNILEVER FCU thus made misleading and inaccurate advertisements in violation 12 CFR § 707.8(a) by touting dual location, continued services, and even advertising additional services not relevant to UNILEVER FCU. We detrimentally relied on these representations to continue to hold deposits.

We appeal to the NCUA Board to consider all the above listed violations and order restitution. In view of the lack of accurate records which led to the oversight regarding the aggregate joint amount and mistaken transfer, this is akin to "trade error" usually corrected by the institution. The unintended trade error was caused by input errors and negligence/ recklessness/ violation of fiduciary duty by UNILEVER FCU. Garbage/input in recordkeeping system resulted in error shift of funds to uninsured. This was a failure to follow our instructions because the full instruction contained misled reasoning that joint accounts were uninsured. Statement correction by customer is usually allowed within 6 months –there would be time to correct had liquidation not happened abruptly. While I asked for it, the mistaken transfer was based on incorrect UNILEVER FCU records and silent concurrence that joint funds exceeded insurance limits. Consequently, we respectfully request that the Board reverse an unfortunate UNILEVER FCU technical error during a turbulent time of known system instability shortly prior to liquidation. This is a narrow request for error correction, akin to trading error correction that financial services industries recognize as warranting correction rather than enforcement. This analogy applies here.

**CONCLUSION**

On all the grounds expressed above, including member protection, as well as fairness and equity and promotion of trust in the NCUA Insurance as an institution, we respectfully request that all of Our hard-earned funds, additional insured funds of at least **$87,643.46**, plus interest for undue delays (UNILEVER FCU was liquidated on 4/30/25 and funds not received until end of July), be returned to us. We respectfully request that all remaining funds in the amount of $259,625.28 be returned to us.

We appeal to the NCUA Board to consider the circumstances as a whole and restore long-standing joint accounts 20 and 22 which were mistakenly transferred to POD less than 3 months before liquidation. Reinstatement of Joint 20 and 22 is warranted based on UNILEVER FCU record keeping errors. UNILEVER FCU non-compliance with required accurate Statements and records, giving out erroneous information while online information was missing, is a breach of fiduciary duty, resulting in harm, warranting reversal of the UNILEVER FCU mistaken transfer taking place in the unique period of turmoil just prior to liquidation.

Granting this Appeal by ordering additional Insured Funds will result in immediate relief without the further need of Judicial review under 12 CFR 745.202, 12 USC 1787(d) (e.g. Federal court review of administrative and constitutional violations, and other legal claims against responsible parties.) OIG investigation for institutional accountability and negative publicity will be avoided.

Respectfully submitted,


Ellen and Alex Plotkin


Attachments:
1. Emails on or about January 29 - February 7, 2025 regarding errors caused by improper documentation and core processor system Errors (*Marked for Emphasis*);
   Emails on or about October 30, 2023 showing Advisory Relationship with UNILEVER FCU.
2. **September 2024** Monthly Statement showing correct account titles/ownership.
3. **October-December 2024** Quarterly Statement showing incorrect account titles/ownership.
4. Screen Shot of the Share Certificate **37** record of February 10, 2025-persistent record errors.

7

**REQUEST FOR ORAL HEARING**

We request an Oral Hearing in order to make an oral presentation in support of the appeal under 12 CFR §746.204 (g) and explain the unique circumstances that led to a reversible mistake in this case. We would like to point out the totality of the circumstances, the unique factual case, and correctable errors at issue here, which is best done verbally and in an interactive manner with the Board.

This is not a case of routine insurance determination where written submissions suffice. The unique circumstances – institutional failure during pre-liquidation period, documented record-keeping violations leading to transfer contrary to express purpose, absence of proper documentation – warrant the enhanced procedural protection of an oral hearing.

We ask for a fair hearing in this matter.

We are open to either an in-person or video conference participation.

To report errors or make inquiries about loans marked with an * write to :

## STATEMENT OF ACCOUNT

To report or make inquiries about electronic fund transfers "EFT", write to address on left or call:

UNILEVER FCU
700 SYLVAN AVE
ENGLEWOOD CLIFFS   NJ   07632

203-816-4041

34108000-00509

Each loan marked * is an open-end loan. The balance used to compute the finance charge on open-end loans is the unpaid principal balance at the time of the transaction. On the date an advance is taken, the amount of the advance is added to the unpaid principal balance. On the date a payment is made, the finance charge and any late charges due are deducted from the payment amount and the remainder, if any, is subtracted from the unpaid principal balance. The Annual Percentage Rate (APR) is shown in the loan summary below. The phrase "(MAY VARY)" means that this loan has a variable Annual Percentage Rate.

The Annual Percentage Rate (APR) is shown in the loan summary below. The phrase "(MAY VARY)" means that this loan has a variable Annual Percentage Rate.

| STATEMENT PERIOD | |
|---|---|
| FROM | TO |
| 10-01-24 | 12-31-24 |
| MEMBER NUMBER | |
| | 11 596 |
| -  - | 1 |
| SOC. SEC. NUMBER | PAGE |

ELLEN PLOTKIN
ALEX PLOTKIN
43 SAXONIA AVE
WYCKOFF NJ   07481

| DATE MO DAY Y | TYPE OF ACCOUNT / TYPE OF TRANSACTION | LOAN PAYMENT AMOUNT | FINANCE CHARGE | FEE OR LATE CHARGES | CHANGE TO BALANCE | BALANCE |
|---|---|---|---|---|---|---|
| 10 01 4<br>12 31 4 | REG SHARE ACCOUNT<br>JOINT OWNER   : ALEX PLOTKIN<br>REG SHARE ACCOUNT | | | PREVIOUS BALANCE<br>NEW SHARE BALANCE | | 816<br>816 |
| 10 01 4<br>12 31 4<br>12 31 4 | JOINT OWNER   : ALEX PLOTKIN<br>0000020 24M CERT - OVER 10K<br>DIVIDEND<br>MATURE 10-01-25   5.000 | | | PREVIOUS BALANCE<br>NEW CERT. BALANCE | 72965 | 5789624<br>5862589<br>5862589 |
| 10 01 4<br>12 31 4<br>12 31 4 | JOINT OWNER   : ALEX PLOTKIN<br>0000021 24M CERT - OVER 10K<br>DIVIDEND<br>MATURE 10-01-25   5.000 | | | PREVIOUS BALANCE<br>NEW CERT. BALANCE | 323183 | 25643893<br>25967076<br>25967076 |
| 10 01 4<br>12 31 4<br>12 31 4 | JOINT OWNER   : ALEX PLOTKIN<br>0000022 24M CERT - OVER 10K<br>DIVIDEND<br>MATURE 10-01-25   5.000 | | | PREVIOUS BALANCE<br>NEW CERT. BALANCE | 68440 | 5430565<br>5499005<br>5499005 |
| 10 01 4<br>12 31 4<br>12 31 4 | JOINT OWNER   : ALEX PLOTKIN<br>0000028 24M CERT - OVER 10K<br>DIVIDEND<br>MATURE 10-01-25   5.000 | | | PREVIOUS BALANCE<br>NEW CERT. BALANCE | 143244 | 11366100<br>11509344<br>11509344 |
| 10 01 4<br>12 31 4<br>12 31 4 | JOINT OWNER   : ALEX PLOTKIN<br>0000029 24M CERT - OVER 10K<br>DIVIDEND<br>MATURE 10-01-25   5.000 | | | PREVIOUS BALANCE<br>NEW CERT. BALANCE | 128950 | 10231936<br>10360886<br>10360886 |
| 10 01 4<br>12 31 4<br>12 31 4 | JOINT OWNER   : ALEX PLOTKIN<br>0000034 24M CERT - OVER 10K<br>DIVIDEND<br>MATURE 10-01-25   5.000 | | | PREVIOUS BALANCE<br>NEW CERT. BALANCE | 478884 | 37998375<br>38477259<br>38477259 |
| 10 01 4<br>12 31 4<br>12 31 4 | JOINT OWNER   : ALEX PLOTKIN<br>0000035 24M CERT - OVER 10K<br>DIVIDEND<br>MATURE 10-01-25   5.000 | | | PREVIOUS BALANCE<br>NEW CERT. BALANCE | 68589 | 5442417<br>5511006<br>5511006 |
| 10 01 4<br>12 31 4<br>12 31 4 | JOINT OWNER   : ALEX PLOTKIN<br>0000036 24M CERT - OVER 10K<br>DIVIDEND<br>MATURE 10-01-25   5.000 | | | PREVIOUS BALANCE<br>NEW CERT. BALANCE | 206104 | 16353903<br>16560007<br>16560007 |
| 10 01 4<br>12 31 4<br>12 31 4 | 0000037 24M CERT - OVER 10K<br>DIVIDEND<br>MATURE 10-01-25   5.000 | | | PREVIOUS BALANCE<br>NEW CERT. BALANCE | 412597 | 32738701<br>33151298<br>33151298 |

CONTINUED NEXT PAGE

This statement is a permanent record of your account. Income tax information appears at the end of the statement

To report errors or make inquiries about loans marked with an * write to :

## STATEMENT OF ACCOUNT

To report or make inquiries about electronic fund transfers "EFT", write to address on left or call :

UNILEVER FCU
700 SYLVAN AVE
ENGLEWOOD CLIFFS   NJ   07632

203-816-4041

34108000-00509

Each loan marked * is an open-end loan. The balance used to compute the finance charge on open-end loans is the unpaid principal balance at the time of the transaction. On the date an advance is taken, the amount of the advance is added to the unpaid principal balance. On the date a payment is made, the finance charge and any late charges due are deducted from the payment amount and the remainder, if any, is subtracted from the unpaid principal balance. The Annual Percentage Rate (APR) is shown in the loan summary below. The phrase "(MAY VARY)" means that this loan has a variable Annual Percentage Rate.

The Annual Percentage Rate (APR) is shown in the loan summary below. The phrase "(MAY VARY)" means that this loan has a variable Annual Percentage Rate.

| STATEMENT PERIOD | |
| --- | --- |
| FROM | TO |
| 10-01-24 | 12-31-24 |

| MEMBER NUMBER | |
| --- | --- |
| | 11  596 |
| -    - | 2 |
| SOC. SEC. NUMBER | PAGE |

ELLEN PLOTKIN
ALEX PLOTKIN
43 SAXONIA AVE
WYCKOFF NJ   07481

| DATE MO DAY Y | TYPE OF ACCOUNT / TYPE OF TRANSACTION | LOAN PAYMENT AMOUNT | FINANCE CHARGE | FEE OR LATE CHARGES | CHANGE TO BALANCE | BALANCE |
| --- | --- | --- | --- | --- | --- | --- |
| | | | | | | |

```
------------ ******** 2024 YEAR-TO-DATE FINANCIAL SUMMARY ******** ----------------
       DIV/INT      DIV/INT        MORTGAGE      MORTGAGE    MORTGAGE      OTHER NON-MTG
        PAID       WITHHOLDING      POINTS       LATE CHG   FINANCE CHG   FINANCE CHG
      91047.68        0.00          0.00          0.00        0.00            0.00
```

ACCESS YOUR CREDIT CARD ACCOUNT THROUGH ONLINE BANKING!
The eZcard credit card portal is now fully integrated into
ONLINE BANKING.  Open the loan link/credit card account
to get connected.  Manage all accounts in one platform!

This statement is a permanent record of your account. Income tax information appears at the end of the statement.

# EXHIBIT J - Notice to Chairman Hauptman

From: Ellen Plotkin                                                                        April 9, 2026
ellenpltkn@gmail.com
551-298-2483

To: Honorable Chairman Kyle S. Hauptman
Chairman of NCUA and NCUA Board
VIA EMAIL: boardmail@ncua.gov
VIA FACSIMILE: 703-518-6660

Frank Kressman, Esq.
General Counsel, NCUA
VIA EMAIL: ogcmail@ncua.gov
VIA FACSIMILE: 703-518-6667

Re: Unilever Federal Credit Union (Charter No. 5736) - Accounts 11596 – Board Appeal BD-10-25

NOTICE OF IMMINENT APA JUDICIAL REVIEW

Honorable Chairman Hauptman and Mr. Kressman:

I write in connection with the February 13, 2026 disposition of my Board appeal (Docket No. BD-10-25), which the agency has since confirmed constitutes a final agency action reviewable under the Administrative Procedure Act. While I recognize that the Chairman is not required to consider pre-litigation submissions of this nature, this letter serves both as:

1.  Formal notice of imminent filing for judicial review under 5 U.S.C. §§ 701–706 and 12 C.F.R. § 745.202(c); and
2.  A final opportunity for the agency to resolve this matter on a narrow, non-precedential basis prior to litigation.

The purpose of this letter is to provide sufficient background and a focused presentation of key issues to afford the agency a meaningful opportunity to address and resolve this matter prior to litigation. The forthcoming Complaint articulates a substantially more detailed factual and legal record, including additional documentary evidence and sworn submissions, as well as finalized allegations, jurisdictional statements, and party designations (Ellen Plotkin and Alexander Plotkin as Plaintiffs; National Credit Union Administration, and Kyle S. Hauptman, in his official capacity as Chairman of the NCUA, and the sole member of the NCUA Board at the time of the final agency action challenged in this case as Defendants).

Absent resolution, a Complaint will be filed in the United States District Court for the District of New Jersey within the statutory period, on or before April 13, 2026.

## I. Procedural Posture: No Adjudication Occurred

The agency has confirmed that the Board did not issue a decision within 90 days and that the appeal was therefore deemed denied. No findings were issued. No reasoning was provided. No *de novo* review was conducted; instead, the agency relied on the lapse of time provision to effect a deemed denial.

This is not merely an unfavorable decision—it is the absence of a decision.

At the time of this appeal, the NCUA Board consisted of a single member exercising consolidated authority during a period of acknowledged institutional transition, including workforce reductions and deregulatory initiatives. In that context, the agency's obligation to issue a reasoned, attributable decision based on the administrative record was particularly critical.

The governing regulation requires a *de novo* review based on the full administrative record. Instead, the agency relied on inaction as disposition.

The resulting "decision" is not attributable to any decisionmaker and contains no reasoning, no findings, and no application of law to fact.

This defect alone renders the agency action unlawful under 5 U.S.C. § 706(2).

## II. Core Substantive Issue: Reliance on Defective and Contradictory Records

This case presents a narrow but critical failure of administrative decision-making.

The agency treated UFCU account records as legally conclusive while failing to resolve contradictions within those same records.

### A. OIG Report (Agency Knowledge of UFCU Record Integrity Context)

By the time of the February 13, 2026 final agency action, the agency had actual, contemporaneous. knowledge of the NCUA Office of Inspector General semi-annual report, which publicly reported that UFCU was liquidated due to fraud, stating:

> *Unilever was involuntarily liquidated due to fraud. Two credit union employees hid borrowings and used them to conceal their fraudulent activity and mask the credit union's true liquidity position.*

This finding is directly relevant to the reliability and integrity of UFCU's records. It reflects a fraud-compromised operating environment at a small credit union under evident liquidity pressure since 2022, with five employees, of whom only two handled share certificates—CEO Jim Kopfensteiner and member-facing assistant Beverly Lazzaro, bearing directly on the credibility and integrity of the data on which the agency relied.

### B. Comparator Case (Agency Knowledge of Unreliability of UFCU Share Certificate Accounts)

By the time of the February 13, 2026 final agency action, the agency also had actual, contemporaneous knowledge of substantially similar record defects and misleading member-facing communications in other UFCU matters, including Board Appeal BD-08-25 (Member #13236), where documentary evidence (submitted on or about September 2025) demonstrated materially similar disparities and blind shifts of otherwise insured accounts into POD classifications. That knowledge underscores that the agency's reliance here was not inadvertent, but occurred in the face of known record unreliability. Both BD-08-25 (Member #13236) and the present matter (Member #11596) involved evidence-heavy records and large depositors with complex, multi-certificate portfolios requiring careful application of insurance classification and POD aggregation rules.

Thus, at the time of the final agency action, the agency had actual knowledge that:

- UFCU records were unreliable and internally inconsistent
- Fraud had distorted liquidity and reporting
- Internal systems reflected inconsistent Share Certificate ownership classifications

Disparate treatment arising from this comparator is addressed separately in Section VI below.

### III. CD20 and CD22 Transfer: Extensive Written Evidence Submitted but not Considered

The entirety of the agency's review of the administrative record effectively ended with AMAC's response to the reconsideration request, relying on a purported Member instruction dated January 29, 2025.

2

However, that instruction was born out of underlying inaccurate and missing ownership classifications on Account statements provided by UFCU. Error-propagated records → erroneous transfer → still and more error-propagated records. The resulting transfer occurred during a period of known operational instability, including system changes and record inconsistencies about 90 days before liquidation. The transfer must be reversed.

### IV. CD37: Independent Basis for Relief: Extensive Written Evidence Submitted but not Considered

The administrative record demonstrates: Conflicting and missing classification (Single versus POD); inconsistent system coding and periodic account statements; missing or erroneous system fields in screenshots provided to the member; written assurances inconsistent with POD classification. CD 37 must be reclassified as Single.

### V. Misapplication of the "Conclusive Records" Rule Under 12 C.F.R. Part 745 Resulting in Regulation by Enforcement through Unwritten Rule.

The records are internally inconsistent and unreliable, and therefore cannot serve as a conclusive basis for insurance determination. Treating such records as dispositive operates, in effect, as regulation by enforcement. Under NCUA regulations, "the account records of the credit union shall be conclusive as to the existence of any relationship pursuant to which the funds in the account are deposited." 12 C.F.R. Part 745. **Here, however, the agency is effectively picking and choosing from confusing, error-propagated, and fraud-impacted account records only those elements that support POD aggregation, while disregarding contradictory fields, statements, and member communications— thereby converting a conclusive-records rule into a selective, outcome-driven application.**

By contrast, the FDIC conditions reliance on deposit account records on clarity and permits consideration of other evidence where records are ambiguous or unreliable. As the FDIC provides:

> *If… records… are clear and unambiguous, those records shall be considered binding… [but] if… ambiguous or unclear… the FDIC may consider evidence other than the deposit account records… and may consider all available evidence… on the basis of the actual rather than the misrepresented ownership.*

The NCUA applied no comparable standard here. Instead, it treated compromised and contradictory records as conclusive while declining to resolve their inconsistencies or consider surrounding evidence. While 12 C.F.R. § 745.2(c)(1) states: *"The account records of the credit union shall be conclusive…,"* it is implicit that regard must be given to whether those records are clear and unambiguous.

### VI. Inconsistent Agency Treatment (Comparator Evidence: Member 13236, Board Appeal BD-08-25)

In Board Appeal BD-08-25 (Member #13236), involving the same credit union, same liquidation, same regulatory framework, and the same Special Counsel, the agency:

- Evaluated contemporaneous member communications with UFCU staff
- Acknowledged inconsistencies in account classification (including hybrid Single/POD or unclear designations)
- Considered evidence outside rigid account labels where records were unreliable
- Ultimately corrected classification outcomes in favor of the member

By contrast, in this case (BD-10-25, Member 11596), the agency:

- Relied on a single line of a January 29, 2025 email as dispositive instruction

3

- Ignored surrounding context within that same communication
- Disregarded conflicting system records, statements, and screenshots
- Declined to reconcile known inconsistencies in UFCU data
- Issued no decision, findings, or reasoning at all

At the time of the February 13, 2026 final agency action in this matter the agency had actual knowledge—through the BD-08-25 appeal filed in September 2025, as well as internal supervisory information and contemporaneous communications—that UFCU records were unreliable and internally inconsistent. That record included substantially similar proof of misleading, erroneous member-facing communications and disparities across account records, particularly involving the blind shift of otherwise insured account balances into POD designations.

This is not a difference in facts. It is a difference in treatment.

The failure to apply the same evaluative approach to materially similar circumstances constitutes arbitrary and inconsistent agency action under the APA.

## VII. Basis for Case-Specific Resolution

This case does not require any broad or systemic rule.

It presents a discrete, fact-specific administrative failure grounded in: Documented record inconsistency, Proven reliance on defective information, a known fraud-impacted small institutional environment; and absence of an actual adjudicative decision. These factors permit resolution on narrow, case-specific grounds without establishing any broader precedent.

## VIII. Timing, Reservation of Rights, and Opportunity to Resolve

This notice does not toll or waive the 60-day limitations period under 12 C.F.R. § 745.202(c). All rights are expressly reserved.

Unless resolved, Plaintiffs will file for judicial review within that statutory period.

The agency can still resolve this matter without litigation by:

- Reversing the CD20 and CD22 transfer; and
- Reclassifying CD37 as a Single account;
- Alternatively, vacating the prior determination and remanding for a *de novo* review under the specific constraints set forth in the forthcoming Complaint, including:
  - (i)     Consideration of the complete administrative record rather than reliance on isolated excerpts (including the January 29, 2025 communication in context);
  - (ii)    Reconciliation of conflicting account records, statements, and system data relating to CD37 and related certificates;
  - (iii)   Evaluation of contemporaneous member-facing communications and disclosures; and
  - (iv)    Issuance of reasoned findings addressing both record inconsistencies and the differential treatment relative to BF-08-25.

Written confirmation of agency action is requested by close of business on Friday, April 10.

Respectfully submitted,

*Ellen Plotkin*

4

ATTACHMENTS

**Exhibit B – March 3, 2026 NCUA Clarification Letter (Deemed Denial)**

Confirms that Board decision was not issued within the required period and that the appeal was deemed denied pursuant to 12 C.F.R. § 746.206(b), thereby exhausting administrative remedies and rendering the matter reviewable under the APA.

**Exhibit E – February 7, 2025 UFCU Email (Core System / Missing Ownership Information)**

Confirms recent core system transition and lack of member visibility into ownership details and classifications, demonstrating that instructions during this period were based on incomplete and unreliable information.

**Exhibit F – February 10, 2025 CD37 System Screenshot**

Reflects internal system data for CD37 showing objective inconsistencies, including: (i) incorrect maturity date; (ii) absence of a populated POD designation field; and (iii) conflicting or unrecognizable account identifiers, demonstrating unreliable account records for insurance classification purposes.

*These exhibits are provided to illustrate the specific record defects and procedural posture described above and are not intended to constitute the full evidentiary record.*

## Exhibit K

### Sworn Declaration of Comparator (Member #13236)

I, Rimma Mitelman, a member-owner #13236 of liquidated Unilever Federal Credit Union ("UFCU"), declare under penalty of perjury as follows:

1. Member #11596 and I worked together as Unilever patent lawyers at Unilever headquarters in Englewood Cliffs NJ for about 20 years.

2. For many years I was a valued member of UFCU and invested substantial savings in multiple share certificates. My account dispute with NCUA concerned the insurance treatment of UFCU share certificates and related ownership classifications, specifically Single/POD determination.

3. After my retirement from Unilever in 2018, my dealings with UFCU concerning my certificates, ownership designations, and insurance coverage were conducted by email with CEO/Treasurer Jim Kopfensteiner and his assistant Beverly Lazzaro. I relied on their written assurances of expertise, together with UFCU account records and statements, to understand how my accounts were structured and insured.

4. In my case, UFCU staff expressly represented that accounts could be structured so funds would be fully insured, including communications reflecting that members with over one million dollars on deposit could structure accounts in different ways to achieve full insurance coverage.

5. In my case, the same UFCU personnel used ownership descriptions that were internally inconsistent and confusing, including combinations such as "single and POD" and "joint and POD." These mixed descriptions were repeated across multiple communications and were not resolved into a single clear labeled classification.

6. Accordingly, UFCU account records were not conclusive and could not be reasonably relied on to either support or deny insured status; in my case the agency ultimately resolved those ambiguities by taking the position most favorable to me.

7. AMAC initially determined that a portion of my funds was uninsured and denied reconsideration. My Board appeal presented the full factual context, including the insurance-structuring assurances, mixed ownership descriptions, and resulting confusion reflected in contemporaneous communications and records.

8. Following UFCU's liquidation, Member 11596 and I shared information and documents relating to UFCU, including emails, account records, statements, screenshots, and agency correspondence.

Page **1** of **5**

9. Based on the materials I reviewed, Member #11596's matter arose from the same credit union, the same liquidation, the same two UFCU personnel, and involved the same type of account-ownership issues arising from inconsistent UFCU records, communications, and account documentation, with Member #11596 likewise maintaining substantial share certificates and relying on UFCU communications and records in attempting to maintain insured status.

10. Based on the materials I reviewed, Member #11596's records, like mine, were internally inconsistent, including discrepancies across statements and systems regarding whether accounts were classified as single, joint, or POD; lack of reliable online ownership information at critical times; instructions that corrections would appear only in future statements; and irregularities in account screenshots.

11. Both matters therefore involved reliance on the same UFCU personnel, confusion generated by UFCU's own records and communications, conflicting ownership descriptions derived from multiple inconsistent documents, large certificate holders with long-standing written expertise and acknowledgements from UFCU, and the same April 30, 2025 liquidation evaluated under the same regulatory framework.

12. Any surface-level factual differences do not diminish their overwhelming similarity in all material respects. In my case, the inconsistency appeared most clearly in hybrid ownership descriptions attached to certificate openings. In Member #11596's case, the inconsistency appeared most clearly in mismatches among statements, shifting ownership designations (single, POD), online system limitations, email communications, and account screenshots. In both matters, UFCU's records and member-facing communications did not present a conclusive ownership classification. In my case, the agency identified "explicit intent" based on communications requesting POD; in Member #11596's case, contemporaneous communications reflect an intent to maintain insured status and to correct inaccurate and incomplete ownership information.

12A. I made a Table below to evaluate whether I can lawfully make this Sworn Declaration. I compared the material similarity of the underlying facts and the divergence in agency treatment. I made the Table based on information and belief and review of the relevant records. This Table is not meant to be an exhaustive list, but only the facts as they appear to me today based on the materials I reviewed up to date.

**Comparator Table – Plaintiff (Member #11596) vs Comparator (Member #13236)
(Grouped by Degree of Sameness)**

## I. IDENTICAL FACTS

| | Fact | Plaintiff (Member #11596) | Comparator (Member #13236) |
|---|---|---|---|
| 1 | Same institution (UFCU) | UFCU | UFCU |
| 2 | Same period through liquidation | Decades-long through April 30, 2025 liquidation | Decades-long through April 30, 2025 liquidation |
| 3 | Same personnel; offering expertise and assurances regarding structuring accounts for full federal insurance coverage (Lazzaro/Kopfensteiner) | Lazzaro; Kopfensteiner (documented offering of expertise and assurances) | Lazzaro; Kopfensteiner (documented offering of expertise and assurances) |
| 4 | Same email channel; unreliable/limited online visibility | Email-based with inconsistent online access to ownership information | Email-based with inconsistent online access to ownership information |
| 5 | Same depositor profile (large CD holders) | Large certificate holder | Large certificate holder |
| 6 | Same account type (multiple CDs) | Multiple share certificates | Multiple share certificates |
| 7 | Same issue: ownership classification and POD aggregation limits | Ownership classification; POD aggregation | Ownership classification; POD aggregation |
| 8 | Same starting posture (initial denial) | Initial denial followed by appeal | Initial denial followed by appeal |
| 9 | Same procedural timeline: appeal filed within same liquidation review window and decided within comparable timeframe | Appeal filed November 12, 2025; decision issued February 13, 2026 (deemed denial) | Appeal filed in September of 2025; decision issued January 30, 2026 ( |

## II. FUNCTIONALLY IDENTICAL (SAME DEFECT, DIFFERENT FORM)

| | Fact | Plaintiff (Member #11596) | Comparator (Member #13236) |
|---|---|---|---|
| 10 | Hybrid/shifting labels → non- | Shifting labels across | Hybrid labels ("single |

| | Fact | Plaintiff (Member #11596) | Comparator (Member #13236) |
|---|---|---|---|
| | conclusive ownership classification | systems/statements | and POD") |
| 11 | Inconsistent records/communications → unreliable ownership data | Inconsistent + system-disrupted records | Internally inconsistent communications |
| 12 | Personnel vs system inconsistencies → same effect | Conflicting e-mailsCore processor + data inconsistencies | Conflicting e-mails |
| 13 | Member reliance on staff communications | Relied on staff + emails | Relied on staff + emails |
| 13 | Unstable designations → records not reliably determinative | Shifting classification | Hybrid classification |

## III. KEY POINTS OF DIFFERENCE (AGENCY TREATMENT, NOT FACTS)

| | Fact | Plaintiff (Member #11596) | Comparator (Member #13236) |
|---|---|---|---|
| 1 | Same evidence → different intent inference | Interpreted as intent to maintain insurance | Interpreted as POD intent |
| 2 | Ambiguity resolved differently | Not resolved in member's favor | Resolved in member's favor |
| 3 | Different evaluation approach | Relied on selected record fragments | Considered full context and communications |
| 4 | Different outcome from similar inputs | No comparable adjustment | +$250,000 insured (revised determination) |

12B. As shown above, the two matters share the same material factual inputs, and the divergence arises solely from the agency's interpretation and resolution of those facts.

13. In my matter, after initial denial, the agency ultimately issued a revised reconsideration determination that increased my insured coverage by $250,000 by taking the position most favorable to me. Based on the materials I reviewed, Member #11596's matter was not resolved in that manner.

14. I make this declaration in order to: (i) provide factual comparator evidence demonstrating that materially similar factual circumstances were treated differently by the agency; (ii) to evidence NCUA' s knowledge of UFCU account records' unreliability; and iii) to evidence that NCUA is capable of conducting a

whole record *de novo* review and resolve inconclusive records by taking the position most favorable to a member.

15. Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing statements are true and correct. I understand that any knowingly false statement of material fact in this Sworn Declaration may subject me to criminal penalties for perjury and related offenses under federal law.

Executed on April 13, 2025, at Rockingham, VT.

**Rimma Mitelman** Digitally signed by Rimma Mitelman
Date: 2026.04.13 04:45:27 -04'00'

Rimma Mitelman (Comparator – Member #13236)

Attachments (from Member 13236 administrative record):

Initial Determination

Appeal w/ Cover Letter

Board Decision



### National Credit Union Administration
### Office of General Counsel

January 30, 2026

SENT BY EMAIL

Rimma Mitelman
41 Birch Street
Emerson, NJ 07630
Rimma.esq@gmail.com

RE: NCUA Board Appeal (Docket No. BD-08-25)

Dear Ms. Mitelman:

I am writing regarding the appeal you filed with the National Credit Union Administration (NCUA) Board, appealing your uninsured shares reconsideration determination by the Liquidating Agent for former Unilever Federal Credit Union.

On January 30, 2026, the Liquidating Agent issued a revised uninsured shares reconsideration determination regarding your accounts. As such, the NCUA is administratively closing this matter.

Should you have any questions, I may be reached by email at pyu@ncua.gov or by phone at 703-548-2666.

Sincerely,

Pamela Yu
Special Counsel to the General Counsel

OGC/PWY:bhs
BD-08-25

cc: Melane Conyers-Ausbrooks, Secretary of the Board

 Gmail                                                        Rimma Mitelman <rimma.esq@gmail.com>

## NCUA Board Appeal (Docket No. BD-08-25)
1 message

**Yu, Pamela** <PYu@ncua.gov>                                                      Fri, Jan 30, 2026 at 1:27 PM
To: "Rimma.esq@gmail.com" <Rimma.esq@gmail.com>

Dear Ms. Mitelman:

Please see the attached regarding your share insurance appeal to the National Credit Union Administration Board.

Best regards,

    **Pamela Yu**

Special Counsel to the General Counsel

National Credit Union Administration

1775 Duke Street | Alexandria, VA 22314

(O) 703-548-2666 | (C) 571-242-4307| pyu@ncua.gov

SENSITIVE ATTORNEY COMMUNICATION: This transmission contains confidential information intended only for the addressee(s). This information may also be privileged and/or subject to attorney work-product protection. If you are not the intended recipient, any use, dissemination, distribution or copying of this transmission, including attachments, is strictly prohibited. If you received this transmission in error, please contact the sender.

---

**Controlled Notice: The information contained in this email and any attachments may be Controlled Unclassified Information subject to dissemination controls, restrictions, or safeguarding requirements pursuant to a federal law, regulation, or policy. Any use, distribution, or copying of this email,**

including any of its contents or attachments by any person other than those authorized by the National Credit Union Administration, or for any purpose other than its intended use, is strictly prohibited. If you believe you have received this email in error, permanently delete the email and any attachments, and do not save, copy, disclose, or rely on any part of the information contained in this email or its attachments. Please call 703-518-6540 if you have questions.

BD-08-25 RMitelman_Final Ltr .pdf
240K

2/6/26, 2:39 PM                                                    Gmail - Unilever Federal Credit Union

 Gmail                                                                                    Rimma Mitelman <rimma.esq@gmail.com>

## Unilever Federal Credit Union

1 message

_AMAC Mail <AMACMAIL@ncua.gov>                                                                       Fri, Jan 30, 2026 at 12:37 PM
To: "rimma.esq@gmail.com" <rimma.esq@gmail.com>

Please see attached regarding your account with Unilever FCU.

Asset Management & Assistance Center - TM

National Credit Union Administration

10910 Domain Dr., Ste 200, Austin, TX 78758,

(O) 512-231-7900 | (F) 703-518-6679 | (E) amacmail@ncua.gov

www.ncua.gov | www.MyCreditUnion.gov

**Stay Informed about the NCUA:** Connect with Us | Hear from Us | Like Us | Subscribe to Us | Follow Us

*This message, including any attachments, may contain confidential and legally privileged*

*information. You may not copy, forward, disclose to any third party, or use this information*

*without permission from NCUA. If you received this information in error, please delete the*

*material including any copies and contact the sender.*

**Controlled Notice: The information contained in this email and any attachments may be Controlled Unclassified Information subject to dissemination
controls, restrictions, or safeguarding requirements pursuant to a federal law, regulation, or policy. Any use, distribution, or copying of this email,**

2/6/26, 2:39 PM                                                  Gmail - Unilever Federal Credit Union

including any of its contents or attachments by any person other than those authorized by the National Credit Union Administration, or for any purpose other than its intended use, is strictly prohibited. If you believe you have received this email in error, permanently delete the email and any attachments, and do not save, copy, disclose, or rely on any part of the information contained in this email or its attachments. Please call 703-518-6540 if you have questions.

**2 attachments**

Updated Reconsideration Response Letter - Rimma Mitelman.pdf
198K

Mitelman UninsuredCertificate - Account 13236 Updated Reconsideration.pdf
206K

 National Credit Union Administration ─────────
Asset Management & Assistance Center

**Updated Uninsured Shares
Reconsideration Determination**

January 29, 2026

SENT BY MAIL AND EMAIL

Ms. Rimma Mitelman
41 Birch St.
Emerson, NJ  07630
Rimma.esq@gmail.com

Dear Ms. Mitelman:

RE: Unilever Federal Credit Union

This is a follow-up to our letter dated July 28, 2025. As you are aware, the Unilever Federal Credit Union was placed into liquidation by the National Credit Union Administration (NCUA) Board on April 30, 2025.

After issuing our letter dated July 28, 2025, we reassessed the structure of your account based on communications documented in the account records between you and the credit union prior to its liquidation. Taking the position most favorable to you with respect to the ownership classification of your CD #23, we have determined your account may reasonably be classified as single ownership, which affords you additional insurance coverage. As a result, our revised reconsideration determination is that, as of the date of liquidation, $80,353.67 of your account is uninsured per Section 207(k) of the Federal Credit Union Act. Enclosed is a check for your additional $250,000 in insured shares.

An explanation of your right to appeal a determination by the liquidating agent is enclosed. You may also find detailed information regarding NCUA's appeals regulation at 12 C.F.R. Part 746, Subpart B.

The enclosed Revised Certificate of Claim in Liquidation enables you to share in the proceeds of the liquidation of the credit union, if any, up to uninsured amount. Please discard the Certificate of Claim sent to you in our letter dated May 29, 2025. The Certificate of Claims sent to Mr. Shukhman at that time are still valid.

---

10910 Domain Drive, Suite 200 – Austin, TX 78758
512-231-7900

Ms. Rimma Mitelman
January 29, 2026
Page 2

If you have any questions, please contact our office by phone at (512) 231-7940 or by email at AMACmail@ncua.gov.

Sincerely,

Cory Phariss
Liquidating Agent

AMAC/MMG:ELM
DLMS-CL-002
FCU 05736-2618
Enclosures (3)

# UPDATED CERTIFICATE OF CLAIM IN LIQUIDATION FOR UNINSURED SHARES

January 30, 2026

Ms. Rimma Mitelman
41 Birch St.
Emerson NJ 07630

The Unilever Federal Credit Union, located in Englewood Cliffs, NJ, was placed into liquidation by the National Credit Union Administration (NCUA) Board on April 30, 2025. The NCUA Board was designated as the liquidating agent of Unilever Federal Credit Union. As Liquidating Agent, I have authority to conclude the affairs of the credit union, guided by Section 207(k) of the Federal Credit Union Act [12 U.S.C. § 1787(k)] and part 745 of NCUA Regulations [12 C.F.R. § 745].

As of the date of liquidation, $53,115.97 of your #13236 account for share certificates #23 and #24 at Unilever Federal Credit Union is uninsured.

This Certificate of Claim in Liquidation enables you to share in the proceeds of the liquidation of the credit union, if any, up to the uninsured amount $53,115.97.



Cory Phariss
Liquidating Agent

Secretary of the Board,  National Credit Union Administration                    September 23, 2025
1775 Duke Street
Alexandria, VA 22314

**Appeal of AMAC Determination – Member #13236, Unilever Federal Credit Union**

Dear NCUA Board:

Pursuant to 12 C.F.R. Part 746, Subpart B, Member #13236 appeals AMAC's May 29, 2025 Initial Determination and July 28, 2025 Reconsideration Determination concerning uninsured shares at Unilever Federal Credit Union.

The appeal does not contest NCUA's finding that UFCU was insolvent on April 30, 2025. The broader public record shows however that:

- either the agency failed to supervise effectively, ignoring visible red flags: by the end of 2022, supervision had to reveal unmistakable warning signs as assets and shares contracted and uninsured exposure spiked, and by October 2024, UFCU's fate was sealed by the foreseeable collapse of its field of membership as Unilever relocated headquarters, with no charter amendment or sponsor support attempted;

- or the agency recognized and documented those weaknesses yet allowed UFCU to maintain its façade of "Safe and Sound," reassuring members through its website and emails while coordinating an orderly wind-down until liquidation in April 2025—timed just before Unilever's relocation hollowed out the field of membership.

In either case, the result was the same: members were blindsided while uninsured balances were maximized to the benefit of the Fund. Call Reports confirm UFCU remained solvent and well capitalized through March 2025, yet members' assets were seized in a lightning strike, providing the liquidation cushion.

Against this background, for the specific CD at issue opened in 2023, the record further shows the regulatorily impossible classification of the account as "single and POD", a blind shift to the uninsured shares despite years of written assurances to the member that deposits were structured for full insurance, and false reassurances on its website and in its specific emails that UFCU will relocate to Hoboken.

The relief requested is to reclassify Share Certificate #23 as a single-ownership account under 12 C.F.R. § 745.3, apply the $250,000 insurance limit, and issue the additional insured payout. The Board can base this outcome solely on the specific, well-documented facts supported by the abundant evidence already provided. Granting this relief ensures that the Board's commendable public commitments are matched by results, while conserving agency resources and de-escalating what would otherwise become a prolonged dispute.

Respectfully submitted,
Rimma Mitelman
Enclosure: **Appeal of AMAC Determinations – Member #13236**

**via USPS Priority Mail Express Return Receipt Requested**


**APPEAL TO THE NATIONAL CREDIT UNION ADMINISTRATION BOARD**
**Pursuant to 12 C.F.R. §§ 745.202, 746.204**


**TO:**
**National Credit Union Administration**
**Secretary of the Board**
**1775 Duke Street**
**Alexandria, VA 22314-3428**

**FROM:**
**Rimma Mitelman**
**41 Birch Street**
**Emerson, NJ 07630**


**RE:**
**Appeal of AMAC Determination Dated July 28, 2025**
**Member #13236 Uninsured Share Balance of $330,353.66**
**Unilever Federal Credit Union (Charter #05736)**

**DATE: September 23, 2025**

# 1. Statement of the Case and Factual Summary (§ 746.204d(1))

A. Statement of the Case – Procedural

On April 30, 2025, the National Credit Union Administration (NCUA), acting through its Asset Management and Assistance Center (AMAC) as liquidating agent, liquidated Unilever Federal Credit Union (UFCU). On May 29, 2025, AMAC issued an Initial Determination finding $330,353.66 of Member #13236's deposits to be uninsured. On June 28, 2025, Member #13236 filed a timely Request for Reconsideration pursuant to 12 C.F.R. § 745.203. On July 28, 2025, AMAC denied reconsideration and affirmed the uninsured balance. This appeal is filed within sixty (60) days of AMAC's denial, as required by 12 C.F.R. § 745.203(d).

B. Chronological Statement

- 1979–2018 – Employment and UFCU Membership. Member #13236 immigrated to the United States as a political refugee, worked at Unilever for 34 years, and maintained longstanding UFCU membership.
  *(Significance: decades of reliance on UFCU as a safe haven).*

- Aug. 8, 2018 – Staff Assurance of Full Insurance
  Beverly to Rimma (cc Jim):
  *"I spoke with Jim and we wanted to let you know that a number of our members have on deposit with us over a million dollars. There are different ways to structure these accounts and I would be happy to go over the different ways to structure your accounts so that they are fully insured."*
  *(Significance: explicit insurance-optimization promise)*

- Dec. 18, 2018 – Safe Terms Inquiry
  *"What CD terms are currently available through our much loved Credit Union?"*
  *(Significance: reliance on UFCU for safe insured options).*

- Feb. 22–24, 2023 – CD #23 Application Staff emails and DocuSign applications described CDs as "single and POD" and "joint and POD."
  *(Significance: induced belief of $750K insured; regulatorily impossible).*

- Feb. 22, 2023 – Continuing Professional Confusion.
  Beverly's email: *"On your account it's joint with Ven and POD to Alex. So that is insured up to $500K. On Ven's account his is single so that is insured up to $250K."*
  *(Significance: illustrates staff's contradictory explanation — "Joint AND POD"; reinforced the member's belief in a safe Single + Joint structure; the POD was treated as a mere add-on beneficiary label, not as a category change affecting coverage.)*

2

- Mar. 1, 2023 – "Impossibility" Confirmation.
  Beverly: *"Got the call from the Feds. ... One is joint ... the other single, and both are POD to Alex."*
  *(Significance: smoking gun; "single and POD" is regulatorily impossible; shows contemporaneous federal awareness).*

- Aug. 16, 2023 – Six Months After POD Implementation, Member Still Confused
  Member's email: *"I believed [it] was a single-ownership category CD supposed to be about max 500K and the other 250K — in my name only."*
  *(Significance: proves the institution failed to disclose POD aggregation consequences; member continued to rely on her understanding of a Single + Joint structure; professional consultation relationship heightened duty of disclosure.)*

- Aug. 26, 2024 – Sponsor Relocation Announced. Unilever announced headquarters move from Englewood Cliffs to Hoboken.
  *(Significance: FOM vulnerability made public, including NCUA).*

- Sept. 2024 – POD Rule Revision. NCUA revised POD rules acknowledging they were "difficult to apply."
  *(Significance: confirms confusion).*

- Nov. 2024 – WARN Notice & Headcount Contraction. Unilever filed WARN Act notices disclosing 149 layoffs at Englewood Cliffs tied to the relocation. By late 2024, only ~250 employees remained on site.
  *(Significance: sharp erosion of the Englewood Cliffs employment base — the core of UFCU's field of membership).*

- Apr. 30, 2025 – NCUA Liquidation. NCUA cites "insolvency." March 2025 Call Report showed UFCU solvent/well-capitalized.
  *(Significance: discrepancy between insolvency claim and official data).*

- May 8–9, 2025 – First Member Notice. Deposits frozen—no chance for protective action, cooperation with UFCU Board, or avoiding members' loss of $5.5 million in uninsured shares.

- June 5, 2025 – Ribbon-Cutting Ceremony. Public opening of Hoboken Unilever HQ.
  *(Significance: sponsor's physical departure from Englewood Cliffs formalized and FOM base collapsed).*

- May 29, 2025 – Initial Determination. Declared $330,353.66 uninsured; relied on UFCU records and pasted table.

3

- June 28, 2025 – Request for Reconsideration. Member #13236 submitted formal reconsideration to AMAC.

- June–July 2025 – FOIA Requests. Member sought liquidation memorandum, UFCU Board minutes; CAMELS ratings - all categorically withheld.

- July 28, 2025 – Reconsideration Denial. Cory Phariss: *"You correctly stated … 'Single and POD is regulatorily impossible.' … The uninsured balance remains $330,353.66."*

## 2. Statement of Objections and Error in Initial Determination (§ 746.204d(2))

AMAC, as a liquidating agent, confined its review to a technical application of Part 745, deferring to the CD #23 application and selected emails that mention "POD." AMAC admitted the "single and POD" label is regulatorily impossible, yet treated the POD designation as dispositive and affirmed an uninsured balance. This narrow approach ignored the broader factual record: repeated assurances of full insurance, absence of disclosures or calculators, ambiguities in member-facing statements, and the cooperative mandate.

The Board has authority to re-classify CD#23 in this case based on the reasons provided in the Reconsideration Request and extensive written evidence submitted therewith.

## 3. Additional Evidence and Materials Relied Upon (§ 746.204d(3))

The record demonstrates that AMAC's July 28, 2025 denial rested on a narrow application of Part 745, treating a "single and POD" notation as dispositive.

Board review, however, must be meaningful, not hollow. If the Board merely affirms AMAC's narrow reliance on UFCU records, the appeal process is reduced to a shell: AMAC simply rubber-stamps incomplete or contradictory UFCU records, and the Board in turn rubber-stamps AMAC. Such a cycle defeats the purpose of § 746.204 by leaving members without any substantive review of the entire record.

## A. Summary

This appeal arises in the very environment the Board has acknowledged: the need to right-size regulations, reduce contradictions, and protect members through clarity and transparency. The Board's commitments are commendable, but they must be matched by results. In this case, members were denied disclosures, subjected to hidden rules, and left defenseless until after liquidation. Granting the relief requested allows the Board to bring its own stated mission into practice—protecting members as well as the Fund, with a narrow, case-specific correction that requires no broader precedent.

4

The record shows lack of transparency, UFCU structured shift toward uninsured shares beginning in 2022 presumably visible to NCUA, concealment of field-of-membership collapse, invocation of "**insolvency**" inconsistent with Call Report data, **sudden** seizure of assets with post-liquidation notice first received by Petitioner on May 9, 2025.

The seizure of Unilever Federal Credit Union (UFCU) on April 30, 2025 was a lightning-strike liquidation of a 75-year-old institution tied to a Fortune 500 sponsor—sudden and bewildering not just to members but also to seasoned industry observers. NCUA justified the act by citing "insolvency," which is the statutory ground under 12 U.S.C. § 1787(a)(1)(A) and 12 C.F.R. § 700.2. Yet the public record—NCUA's own Call Reports through March 31, 2025—showed consistent solvency (assets exceeded liabilities by roughly $4M) and a strong capital ratio of 9.67% (well above the 7% threshold for "well capitalized" under 12 C.F.R. § 702.102).

If insolvency was real, it must have arisen catastrophically in April 2025 after the Call Report, but NCUA has never explained this. If insolvency was not the true ground, then the more plausible explanation is the collapse of the field of membership (FOM) once Unilever moved its headquarters to Hoboken without supporting a charter amendment. Under the Chartering and FOM Manual, *"a single occupational common bond federal credit union must amend its charter whenever the group it serves is restructured or relocated"* (12 C.F.R. Part 701, App. B, II.B.2). That scenario was foreseeable, not sudden, and required sponsor cooperation well before the relocation. No such amendment was filed.

- **Pre-2022:** Approximately 1,600 employees worked in Englewood Cliffs, forming the basis for UFCU's single-sponsor field of membership.

- **2022:** Financial contraction begins at UFCU (assets and shares fall sharply; uninsured exposure rises). Even before relocation announcements, NCUA examiners should have flagged the credit union's dependence on a shrinking sponsor base.

- **August 26, 2024:** Unilever publicly announces relocation of its headquarters to Hoboken, NJ, effective spring 2025.

 - **Late 2024:** Unilever WARN notices filed with New Jersey Department of Labor in November 2024 confirm 149 layoffs in New Jersey tied to the move. By this point, only about 250 employees -R&D staff are planned to remain in Englewood Cliffs. No charter amendment is on record with NCUA, though the Chartering Manual requires one when a sponsor relocates or restructures.

- **June 2025:** Ribbon-cutting at the new Unilever Hoboken HQ. By then, UFCU had already been liquidated for "insolvency."

Beginning in 2022, evidence of structural weakness and foreseeable risk accumulated. Assets and shares contracted sharply, uninsured balances rose, all the while UFCU advertising itself as Safe and Sound. These were red flags that should have alerted both regulators and the sponsor that UFCU's model was unsustainable without change. By late 2024, the trajectory was unmistakable: the core processing system was converted, statements shifted to quarterly, and uninsured balances were clearly flagged in records later relied upon by AMAC. Thus, what

5

appeared to members as a sudden liquidation in April 2025 was in fact foreseeable from at least 2022 onward.

Under the Chartering and FOM Manual, *"a single occupational common bond federal credit union must amend its charter whenever the group it serves is restructured or relocated"* (12 C.F.R. Part 701, App. B, II.B.2). That scenario was foreseeable, not sudden, and required sponsor cooperation well before the relocation. No such amendment was filed.

Members were led to expect relocation, not extinction, while regulators and the sponsor (as it planned and executed relocation) positioned uninsured shares to cushion the Fund—at the expense of the very members NCUA is charged to protect. The sudden timing maximized "uninsured" balances swept into the estate—good for the Fund, devastating for member-owners.

6

## B. UFCU Solvency and Capital Adequacy – December Call Reports 2012–2025

| Year | Total Assets | Total Liabilities | Assets minus Liabilities | § 700.2 Insolvency Test | Total Shares | Uninsured Shares | Uninsured Shares (% of Total Shares) | Number of Current Members | Net Worth Ratio | § 702.102 Capital Adequacy Test |
|---|---|---|---|---|---|---|---|---|---|---|
| 2012 | $50.1M | $45.7M | $4.4M | Not insolvent | $45.7M | $2.8M | 6.2% | 870 | 8.7% | Well capitalized |
| 2013 | $52.4M | $47.9M | $4.5M | Not insolvent | $47.9M | $3.3M | 6.8% | 872 | 8.6% | Well capitalized |
| 2014 | $54.0M | $49.4M | $4.6M | Not insolvent | $49.4M | $3.7M | 7.5% | 874 | 8.5% | Well capitalized |
| 2015 | $54.9M | $49.9M | $5.0M | Not insolvent | $49.9M | $3.9M | 7.8% | 876 | 9.2% | Well capitalized |
| 2016 | $55.2M | $50.6M | $4.6M | Not insolvent | $50.6M | $4.0M | 8.0% | 875 | 8.4% | Well capitalized |
| 2017 | $55.6M | $51.1M | $4.5M | Not insolvent | $51.1M | $4.3M | 8.5% | 874 | 8.1% | Well capitalized |
| 2018 | $55.9M | $51.5M | $4.4M | Not insolvent | $51.5M | $4.6M | 8.9% | 873 | 7.9% | Well capitalized |
| 2019 | $56.0M | $51.7M | $4.3M | Not insolvent | $51.7M | $4.5M | 8.7% | 873 | 7.7% | Well capitalized |
| 2020 | $54.2M | $50.0M | $4.2M | Not insolvent | $50.0M | $3.9M | 7.9% | 874 | 7.8% | Well capitalized |

7

| Year | Total Assets | Total Liabilities | Assets minus Liabilities | § 700.2 Insolvency Test | Total Shares | Uninsured Shares | Uninsured Shares (% of Total Shares) | Number of Current Members | Net Worth Ratio | § 702.102 Capital Adequacy Test |
|------|------|------|------|------|------|------|------|------|------|------|
| 2021 | $51.0M | $46.9M | $4.1M | Not insolvent | $46.9M | $3.9M | 8.4% | 875 | 8.0% | Well capitalized |
| 2022 | $46.5M | $42.2M | $4.3M | Not insolvent | $42.2M | $4.2M | 9.9% | 875 | 9.3% | Well capitalized |
| 2023 | $44.5M | $40.4M | $4.1M | Not insolvent | $40.4M | $4.5M | 11.2% | 875 | 9.2% | Well capitalized |
| 2024 | $43.0M | $38.8M | $4.2M | Not insolvent | $38.8M | $4.8M | 12.4% | 875 | 9.82% | Well capitalized |
| 2025 | $43.0M | $38.84M | $4.16M | Not insolvent | $38.84M | $4.9M | 12.5% | 875 | 9.67% | Well capitalized |

8

## C. Trend Table: Year-Over-Year Δ (delta) Changes 2018–2025

The Δ columns show **year-over-year changes** — the difference between the current year's value and the prior year's value.

| Year | Δ Assets | Δ Liabilities | Δ Equity (Assets – Liabilities) | Δ Net Worth Ratio | Δ Uninsured Shares % |
|---|---|---|---|---|---|
| 2018–19 | +0.1 | +0.2 | −0.1 | −0.2 | −0.2 |
| 2019–20 | −1.8 | −1.7 | −0.1 | +0.1 | −0.8 |
| 2020–21 | −3.2 | −3.1 | −0.1 | +0.2 | +0.5 |
| **2021–22** | **−4.5** | **−4.7** | **+0.2** | **+1.3** | **+1.5** |
| 2022–23 | −2.0 | −1.8 | −0.2 | −0.1 | +1.3 |
| 2023–24 | −1.5 | −1.6 | +0.1 | +0.6 | +1.2 |
| 2024–25 | 0.0 | +0.0 | −0.0 | −0.1 | +0.1 |

**Observations:**

1. **Inverse pattern of Δ Equity and Δ Uninsured %:** In 2021–22, equity rose slightly while uninsured exposure spiked, showing riskier composition even as solvency margins held.
2. **Sustained uninsured growth despite flat equity:** From 2022 onward, Δ Equity hovered near zero, yet uninsured % kept rising.
3. **Capital ratio illusion:** Net worth ratio upticks reflect shrinkage, not genuine growth.
4. **Foreseeability:** The mismatch of equity stability and uninsured growth was visible years before liquidation.

**2022 as the Pivot Year**
The year 2022 marked a decisive turning point for Unilever Federal Credit Union. Macroeconomic pressures mounted as interest rates rose sharply, triggering elevated interest rate risk classifications under NCUA's own supervisory framework, while the mandatory adoption of CECL accounting imposed new governance obligations. At the same time, Unilever's Englewood Cliffs employee base was visibly shrinking, foreshadowing the sponsor's later relocation to Hoboken. UFCU's Call Reports reflected this structural break: assets and shares contracted steeply, yet uninsured balances spiked from 8.4% in 2021 to nearly 10% in 2022, climbing above 12% by liquidation. This divergence created the illusion of stable capital ratios, but only because the denominator had shrunk. From this point forward, UFCU's "Safe and Sound" member-facing posture looked increasingly cosmetic.

**2024–2025: Sponsor Relocation and Liquidation Timing**
By 2024, the sponsor's plans crystallized. On August 26, 2024, Unilever announced the relocation of its U.S. headquarters to Hoboken, NJ, with WARN notices confirming 149 layoffs in New Jersey as part of the move. The new Hoboken facility, at roughly 325,000 square feet, reflected a post-Covid downsizing and hybrid-work model—designed for collaboration and sustainability, but with far fewer employees than the Englewood Cliffs campus. UFCU, still chartered exclusively to serve Englewood Cliffs

9

employees, faced a legal and operational collapse of its field of membership once the move occurred. Yet UFCU's own website advertised its "relocation" to Hoboken alongside Unilever through April 2025, fostering member expectations of continuity. NCUA liquidated UFCU abruptly on April 30, 2025—just weeks before the Hoboken ribbon-cutting—timing that preserved uninsured balances as a cushion for the Share Insurance Fund while leaving members blindsided.

## D. Examiner Red Flags 2018–2025

NCUA's **CAMELS rating system** requires examiners to downgrade institutions showing persistent weaknesses. UFCU showed:

- **Capital adequacy:** Net worth ratio "well capitalized" only by contraction.

- **Asset quality:** Assets shrank steeply from 2021 to 2022; NCUA's Examiner's Guide (Dec. 2024) states: *"A decline in asset size, especially when accompanied by a decline in shares, may signal funding instability and heightened risk exposure."*

- **Liquidity/market sensitivity:** Membership flat, uninsured % rising from ~8% to ~12.5% by 2025. NCUA's IRR Supervisory Framework (2022) warned: *"The rapid rise in interest rates has increased the number of credit unions with elevated interest rate risk classifications."*

**Conclusion:** Across CAMELS dimensions, red flags were visible as early as 2022. If NCUA supervision was effective, both agency and UFCU knew the risks years before liquidation. The increase in uninsured shares was intentionally structured by UFCU and allowed to exist by NCUA.

## E. Transparency Failures and FOIA Process

Member FOIA requests after liquidation were denied or delayed, forcing affected members into a **separate FOIA appeal process under tight deadlines**. NCUA's FOIA rules (12 C.F.R. Part 792) presume disclosure absent valid exemptions. In this case, exemptions were challenged as inapplicable, yet no records were disclosed. This derailed substantive appeals into procedural FOIA disputes.

As one FOIA denial (July 2025) put it: *"No additional records responsive to your request were located."* That left members without access to examiner notes, solvency worksheets, or FOM correspondence that would have revealed the true basis for liquidation.

## F. Protection of the Fund vs. Protection of Members

NCUA conflated "protecting the Fund" with "protecting members." Statute (12 U.S.C. § 1781) emphasizes *protection of member accounts*. The Fund exists to pay insured claims, not to minimize its own payouts. In UFCU's case, liquidation timing/suddenness maximized uninsured balances absorbed

10

into the estate, conserving the Fund but sacrificing members. That outcome may appear fiscally prudent, but it betrays the cooperative purpose of share insurance.

## Conclusion – Ensuring Words Are Matched by Results

At its September 18, 2025 public meeting, the NCUA Board declared:

"One thing that is clear following the feedback process is the outsized burden that obsolete, duplicative, and overly pre- or proscriptive regulations can have on credit unions. And in 2025, we're down over 20% of our workforce. So, we at the NCUA have an operational imperative to right-size everything we do. The current President started the most far-reaching regulatory reform in American history. NCUA is proud to be part of this reform effort, and staff are currently reviewing our regulations to identify burdens that can be lifted."

This statement reflects a commendable stance. Deregulation should mean clarity, efficiency, and fidelity to cooperative purpose: one plain rule, one transparent record, one consistent standard.

Themes throughout this case illustrate the gap between words and practice:

• **Regulation by enforcement** – Rules applied only after liquidation, never disclosed in advance, leaving members defenseless. Even the Board has acknowledged in public forums that members often learn of coverage limits only after the fact.

• **Lack of transparency** – Single-word justifications, withheld records, hollow rationales, and procedural traps. Despite the agency's repeated public commitments to transparency and accountability, members here encountered silence and obfuscation.

• **Breach of cooperative trust** – Members are owners, not customers. In a cooperative, savings are collective property. By blindsiding members, NCUA betrayed the very trust that sustains the credit union model. Board leaders have often invoked "trust in the system" as central to the Share Insurance Fund, but that trust collapses when members are denied even the most basic disclosures.

These themes must also be viewed in light of NCUA's own published priorities on consumer protection:

- From the **Strategic Plan 2022–2026**: "Ensure a safe, sound, and viable system of cooperative credit that protects consumers." "Improve the financial well-being of individuals and communities through access to affordable and equitable financial products and services." "The agency also protects consumers and credit union members."

- From the **2025 Annual Performance Plan**: "This plan is guided by the NCUA's 2022–2026 Strategic Plan, which includes the following strategic goals: (1) Ensure a safe, sound, and viable system of cooperative credit that protects consumers. (2) Improve the financial well-being of individuals and communities through access to affordable and equitable financial products and services. (3) Maximize organizational performance to enable mission success." "Protecting the system of cooperative credit and its member-owners through effective chartering, supervision, regulation, and insurance." "The NCUA protects consumers through effective supervision and enforcement of federal consumer financial protection laws, regulations, and requirements." "The NCUA's consumer financial protection mission goes hand-in-glove with the agency's safety-and-soundness mission." "When it comes to overseeing credit unions, the NCUA's goal is to facilitate their safe and sound operation while ensuring member-owners' assets are protected through full compliance with applicable laws, including consumer financial protection and fair lending laws."

11

- From the **2025 Supervisory Priorities**: "The NCUA will continue to prioritize reviewing compliance with consumer financial protection laws and regulations during every federal credit union examination."

Taken together, the Board's commitments are laudable. But in this case, those commitments were not lived. Instead of clarity, members faced contradictions; instead of transparency, silence; instead of trust, betrayal. By granting the relief requested below, the Board has the opportunity to ensure its words are matched by results—resolving this case fairly, narrowly, and in alignment with its own stated mission to protect members as well as the Fund.

**Relief Requested**

**Member #13236 respectfully requests that the National Credit Union Administration Board reverse AMAC's Initial and Reconsideration Determinations. Specifically:**

- **Reclassify Share Certificate #23 as a single-ownership account under 12 C.F.R. § 745.3, consistent with the member's intent, staff assurances, and the regulatory impossibility of the "single and POD" designation.**
- **Apply the $250,000 single-ownership insurance limit to CD #23.**
- **Issue the additional insured payout accordingly.**

This corrective action applies narrowly to the facts of this case, is non-precedential, and offers the Board the cleanest and legally supported path to resolution.

Respectfully submitted,
Member #13236 – Rimma Mitelman

Enclosures:
AMAC Initial Determination
Reconsideration Request – full submission with evidence
AMAC Reconsideration Denial
FOIA Request
FOIA Denial

12



## National Credit Union Administration
### Asset Management & Assistance Center

# UNINSURED SHARES
# INITIAL DETERMINATION

May 29, 2025

Rimma Mitelman
Veniamin Shukhman
41 Birch St.
Emerson NJ  07630

Dear Rimma Mitelman and Veniamin Shukhman:

RE:   Unilever Federal Credit Union
Account 13236/2618000989

The Unilever Federal Credit Union was placed into liquidation by the National Credit Union Administration (NCUA) Board on April 30, 2025. As the liquidating agent of Unilever Federal Credit Union, I have authority to conclude the affairs of the credit union, pursuant to Section 207(b) of the Federal Credit Union Act [12 U.S.C. § 1787(b)]. This includes the authority to make initial share insurance determinations on Unilever Federal Credit Union accounts.

We have determined that, as of the date of liquidation, $330,353.66 of your revocable trust accounts are uninsured, per Section 207(k) of the Federal Credit Union Act [12 U.S.C. § 1787(k)] and part 745 of NCUA Regulations [12 C.F.R. § 745]. This amount was uninsured because informal revocable trust accounts (i.e., accounts naming payable on death (POD) beneficiaries) are covered up to $250,000.00 per beneficiary, for each owner. Enclosed is a check for $250,000.00 representing Veniamin Shukhman's insured ownership interest of share certificate #24. A $250,000 check was previously issued to Rimma Mitelman representing her ownership interest.

| Account Nickname | Balance | Owner(s) | Beneficiaries |
|---|---|---|---|
| 13236 CD#23 | $275,878.27 | Rimma Mitelman | Alex Shukhman |
| 13236 CD #24 | $554,476.19 | Rimma Mitelman Veniamin Shukhman | Alex Shukhman |

| Insurance Summary | Balance | Insured | Uninsured |
|---|---|---|---|
| Rimma Mitelman POD11 Alex Shukhman | $553,115.97 | $250,000.00 | $303,115.97 |
| Veniamin Shukhman POD-TF Alex Shukhman | $277,237.73 | $250,000.00 | $27,237.73 |

Rimma Mitelman
Veniamin Shukhman
May 29, 2025
Page 2

An explanation of your right to request a reconsideration or appeal a determination by the liquidating agent is enclosed. You may also find detailed information regarding NCUA's appeals regulation at 12 C.F.R. part 746, subpart B.

The enclosed Certificates of Claim in Liquidation enable you to share in the proceeds of the liquidation of the credit union, if any, up to the uninsured amount. Please notify us if you have an address change during the liquidation period prior to receipt of notification of a final distribution or completion of the liquidation.

Also enclosed is a Payable on Death Update Form. With it, you have the option of identifying one or more beneficiaries to any proceeds to which you are entitled from the Certificate of Claim in Liquidation.

If you have any questions or need additional information, please contact member services at (512) 231-7940 or via email at AMACMail@ncua.gov.

Sincerely,

Cory Phariss
Liquidating Agent

AMAC/ELM:MMG
FCU 05736-2618
Enclosures (5)